**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Plaintiff-Appellee.

v.

**NEW ORLEANS PUBLIC SERVICE, INC., Defendant-Appellant.**

No. 86–4577.

United States Court of Appeals, Fifth Circuit.

Sept. 3, 1987.

---

Monroe & Lemann, Eugene G. Taggart, New Orleans, La., for defendant-appellant.

Beth S. Ginsberg, Lawrence E. Blatnik, Attys., U.S. Dept. of Justice, Washington, D.C., James W. Ingram, Carmen Lopez, Dallas, Tex., for plaintiff-appellee.

Before WILLIAMS and HILL, Circuit Judges, and MENTZ,* District Judge

MENTZ, District Judge:

## BACKGROUND

This is a petition for review of an order of the Administrator of the United States Environmental Protection Agency (EPA) assessing a civil penalty under Section 16 of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq.* (1982). This Court has jurisdiction pursuant to Section 16(a)(3) of the TSCA.

In 1955 New Orleans Public Service, Inc. (NOPSI) purchased three, 5000 pound 1250 KVA transformers from General Electric Company. These transformers contained 10–C oil, commonly known as mineral oil. In 1963, the transformers were installed in a room on the second floor of the Jackson Brewery Building in New Orleans (brewery building). The transformers were an integral element of the electrical service furnished by NOPSI to the brewery building, then owned by the Jackson Brewing Company. The transformers were bolted to the floor, and connected with wires to the electrical system of the building. Significantly, there was no written contract between NOPSI and Jackson Brewery regarding the installation of the transformers, nor does the record reflect that there was any oral understanding between the parties.

The building was sold to the American Can Company on May 12, 1978, with the transformers in place. The transformers were used until electrical service was discontinued to the brewery building on June 29, 1979. On January 26, 1982, the American Can Company sold the brewery building to the Jackson Square Investment, Ltd., which planned to convert the structure into a retail mall for shops and restaurants. The sale included all attachments, improvements and components thereof. On behalf of its affiliate,[1] Jackson Brewery Development Corporation, Jackson Square Investment, Ltd. contracted with NOLA Demolishing Company (NOLA), to demolish and remove construction material and equipment from certain parts of the brewery building. The three transformers were located in an area which was to be demolished. Also to be demolished or removed were five other transformers, located in the same room as the three at issue in this case, but which had not been furnished by NOPSI.

In early 1983, Jim Rehkopf, a supervisor for Jackson Brewery met with representatives of NOPSI with regard to the disposition of the transformers which had been installed by NOPSI some twenty years previous. NOPSI was noncommittal about the ownership or disposition of the transformers.

On May 6, 1983, John Blitch, vice-president of Jackson Brewery, advised NOPSI by letter that the demolition of the brewery building was underway and that the three large transformers were still inside the building. Blitch inquired whether NOPSI was interested in recovering the transformers from the building. NOPSI did not respond to this letter. Blitch then called John Thomas, a representative of NOPSI. Thomas subsequently advised Blitch that the transformers "were of no value to [NOPSI] and that [NOPSI] did not want them." Neither Thomas nor any other representative of NOPSI offered to assist in the disposal of the transformers.

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. The record is not clear as to the precise legal relationship between Jackson Brewery Development Company and Jackson Square Investment, Ltd. However, the parties and the Administrative Law Judge treated the entities interchangeably.

In June 1983, NOLA removed all eight transformers from the second floor of the brewery building, including the three 1250 KVA transformers previously installed by NOPSI. The transformers were removed by lifting them with a crane through a window in the transformer room. As one of the three large transformers was being removed, it became lodged in the window and a pipe on the transformer was broken. As a result, approximately 125 gallons of transformer oil were spilled on the ground.

After removal, the oil was drained from the transformers by NOLA and placed in drums. In the process of this transfer, additional oil was spilled. NOLA then sold the transformers as scrap metal.

It was later ascertained that the oil was contaminated by polychlorinated biphenyls (PCBs). Subsequently, in 1983, the Environmental Protection Agency (EPA) filed a complaint against NOLA and Jackson Brewery for the improper storage, marking and disposal of PCBs in violation of the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601–2629. The complaint was then amended to charge NOPSI with a similar violation.

An EPA administrative hearing was held on August 13, 14 and 15, 1985 in the City of New Orleans. On August 13, the Respondent Jackson Brewery settled with the EPA by entering a consent judgment and paying a civil penalty of $5,000, and was severed from these proceedings. Before the hearing began, the EPA voluntarily dismissed its charges against NOPSI for improperly storing, marking and disposing of PCBs. The EPA proceeded against NOPSI on the remaining charge of improper disposal of PCB-contaminated electrical equipment.

On December 16, 1985 the Administrative Law Judge (ALJ), Gerald Harwood, filed his Initial Decision with the Regional Hearing Clerk. In his Initial Decision, the ALJ held that the Respondent NOLA violated TSCA regulations by improper storage, marking and disposal of PCBs and that the Respondent NOPSI violated TSCA regulations by the improper disposal of the electrical transformers. The Initial Decision assessed a $1,000 civil penalty against NOLA and a $17,000 civil penalty against NOPSI. In so doing, Judge Harwood rejected NOPSI's argument that it was not responsible for proper disposal of the transformers since they were component parts of the brewery building which became the property of Jackson Brewery when it purchased the building in January, 1982. The primary reasoning of the judge's decision was that the parties themselves regarded the transformers as movables. Judge Harwood also found that NOPSI had failed to establish that it had abandoned the transformers in June 1979, prior to the effective date of the regulations applicable to PCBs in concentrations of 50 parts per million or more.

On January 13, 1986, the Respondent NOPSI timely filed its Appeal from the Initial Decision of the ALJ with the Administrator of the United States Environmental Protection Agency in Washington, D.C., and on July 28, 1986, the Administrator issued a Final Order affirming the Initial Decision. The Respondent NOPSI timely filed this Petition for Review of the Final Order with this Court on August 13, 1986.

## BURDEN OF PROOF AND STANDARD OF REVIEW

Section 22.24 of the Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties and the Revocation or Suspension of Permits, 40 C.F.R. Section 22.25, *et seq.*, provides that "the complainant has the burden of going forward with and of proving that the violation occurred as set forth in the complaint...." Thus, in the instant case, as part of its claim against NOPSI, the EPA was obligated to prove that the electrical transformers were owned by NOPSI at the time of their disposal in 1983, as such is essential to establishing the elements of the complaint. In order to establish that the transformers were owned by NOPSI at that time, the EPA bore the burden of proving that the electrical transformers were not component parts of the building where they had been installed.

This Court's review of the Administrator's order is governed by the "substantial evidence" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). Accordingly, a reviewing court must uphold agency action unless it is found to be "unsupported by substantial evidence."

However, this rule does not include the agency's determination of legal questions. As stated in *Charter Limousine, Inc. v. Dade County Board of County Commissioners*, 678 F.2d 586 at 588 (5th Cir.1982), this is particularly true "when the decision of the agency is based on an interpretation of a judicial decision that in turn construes the Constitution or a statute."

With these guidelines in mind, we turn to a review of the issue in this case.

### ANALYSIS

■ The sole issue presented for review herein is whether the three 1250 KVA transformers were movables owned by NOPSI or component parts of the brewery building owned by Jackson Square Investment, Ltd.[2] It is undisputed that if the transformers form a component part of the building, then NOPSI has lost all ownership rights in them, hence, they cannot be held liable for the PCB contamination. To determine whether the transformers had become component parts, we must delve into the reticulum of Louisiana property law.

The Louisiana Code Articles governing the classification of things as movables and immovables were revised and re-enacted in 1978, the result being a simplified conceptual framework which substantially altered a number of provisions. Of key significance to the issue at hand is Article 466, which provides as follows:

> Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
>
> Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.

This article was interpreted and explained by a panel of this Court in *Equibank v. United States Internal Revenue Service*, 749 F.2d 1176 (5th Cir.1985).

In *Equibank*, the issue before the Court was a determination of the status of several antique crystal chandeliers, worth as much as $75,000 each, which had been installed in a St. Charles Avenue mansion. The issue arose in a dispute between the IRS and a mortgage holder on the mansion. If the chandeliers were deemed to be a component part of the house, hence immovables, then the mortgage primed an IRS lien. However, if the chandeliers were not a component part of the mansion, then the IRS would have priority.

The court held that the chandeliers satisfied the criteria for permanent attachment pursuant to Article 466, thus were immovables, and, therefore, were subject to Equibank's mortgage. In so holding, the Court articulated five factors to be reviewed in making a determination.

The first three factors discussed by the *Equibank* Court are derived from an analysis of the Civil Code articles pertinent to this topic. First, the Court noted that component parts of immovables are immovables. La.Civ.Code Art. 462. Second, things permanently attached to an immovable are its component parts. La.Civ.Code Art. 466. Third, electrical installations are permanent attachments. *Id.* The Court then discussed two additional steps which, while not specifically enunciated in the Code, logically flowed from the precepts therein contained. The fourth factor is the societal expectation with regard to whether a thing is an "electrical installation" within the meaning of Article 466. Finally, the fifth factor is the degree of skill necessary for a safe connection and disconnection of the thing, inasmuch as society expects a thing to be a component part if a degree of skill in their handling is required.

---

**2.** On appeal, NOPSI did not urge its alternative argument that the transformers were abandoned in 1979 when electrical service to the building was discontinued.

Applying these factors, this court in *Equibank* reasoned that the ordinary view of society would result in the conclusion that chandeliers were a component part of a house. The average, ordinary person would expect that, having thrown a light switch, the lights would go on. What would not be expected is to see a hole in the ceiling with wiring hanging out of it. The first four *Equibank* factors are consistent with the jurisprudence in existence prior to the 1978 revision of the Civil Code. The fifth factor—the specialized skill test—was an innovation, although the foundation for such a consideration was well established.[3]

Both the parties and the administrative law judge analyzed the facts in this matter in light of Article 466 and the *Equibank* decision, without review of what we consider to be a threshold consideration; namely, whether the law to be applied in ascertaining the status of the transformers should be the law in effect at the time of their installation, or some later period. Indeed, as we will explain below, different results would occasion from the application of the law as it existed prior to 1978, and the present law under Article 466.

As a general rule, a law can only proscribe for the future and can have no retroactive effect. La.Civ.Code Art. 8. As a result, the law applicable to a given transaction is that law which was in effect at the time of the transaction. *See,* e.g., *Clarke v. Brecheen,* 387 So.2d 1297 (La.App. 1st Cir.1980).

■ The ban on retroactive operation extends to laws which are substantive—laws which are procedural or remedial can be retroactive, if so designed. *Frito Lay, Inc. v. Wapco Constructors, Inc.,* 520 F.Supp. 186 (M.D.La.1981). The status of the transformers having been initially established at the time of their installation in 1963, the question thus becomes whether the 1978 revision should apply to alter or change that status. We are convinced that it does.[4]

■ We do not believe that characterizing the transformers according to the Article 466 analysis would be a retroactive application of that article. The nature of Article 466 is one of classification, as were its predecessor articles. The legislature may, of course, choose to classify or reclassify a thing, and provided the new definition is applied only to determine status for the purpose of matters arising in the future, the prohibition on retroactive laws is not violated. A law is not made retroactive because it alters the existing classification of a thing. Nor is a law retroactive if it draws upon antecedent facts for its operation. *Henry v. Jean,* 238 La. 314, 115 So.2d 363 (1959). We thus conclude that the ultimate determination of the status of the transformers must be made with reference to Article 466.[5] Nevertheless, an understanding of the law as it existed prior to Article 466 is necessary to provide a complete perspective of this saga of the transformers nobody wanted.

Prior to the revision of the Civil Code in 1978, the question of immovability was governed by Articles 464, 467, 468, and 469

3. *See, Note, Property—Permanent Attachment— The Chandeliers Case,* 61 Tul.Law Rev. 440 (1986).

4. The Court notes with interest the manner in which this issue has been handled by the Louisiana courts. For instance, in *Simmons v. Board of Commissioners for the Port of New Orleans,* 442 So.2d 836 (La.App. 4th Cir.1983) the Court, without reasons given, applied the analysis suggested by present Art. 466, even though the object, a gate, had been installed in 1975. Contrarily, in *McNamara v. Electrode Corp.,* 418 So.2d 652 (La.App. 1st Cir.1982), the court applied the analysis which was in existence prior to present Article 466 to determine whether

certain anodes installed in chlorine/caustic soda producing units called cells were movable or immovable.

5. The Court does not have before it a situation where a vested right has been impaired by the application of the law in this manner. Since NOPSI does not want the transformers, the issue is not present in this case. However, there may arise a circumstance wherein a vested right would be lost, and such might require a different analysis than that herein employed. Nevertheless, in most such circumstances, the requirements of Civil Code Article 495 would protect the parties.

of the Louisiana Civil Code of 1870.[6] Items were classified as "immovable by destination," in contrast to things which were "immovable by nature." Things could also be made immovable by their attachment to an immovable in such a fashion that their removal would damage the immovable. The revision eliminated the concepts of immovable by destination or immovable by nature, the result being only a classification of immovable. Also eliminated was the requirement that there be unity of ownership between the immovable and the movable attached to it. The substance of Article 469 was retained under the new law, so that the law construing that article remains valid.[7]

A leading case on immovables by nature under the prior jurisprudence was *Lafleur v. Foret*, 213 So.2d 141 (La.App. 3d Cir. 1968). The case involved a window air conditioning unit which was attached to racks installed on windows in a residence. The Court, per Judge Tate, held that the units were movables, not immovable by nature, due to the fact that contemporary society would not consider such "luxuries" as an integral part of the building.[8]

A contrary result was reached in *Scott v. Brennan*, 161 La. 1017, 109 So. 822 (1926), where a water heater was classified as an immovable by nature due to its attachment to the building via water pipes. Water pipes being one of the items expressly mentioned in Article 467, the heater was found to be an integral component of the water system.

Immovables by destination, on the other hand, were items which were so closely associated with an immovable that they were considered permanent parts thereof, without regard to the ease with which they could be removed. Thus, wall coverings such as mirrors and marble wainscoting were deemed to be permanent attachments, hence immovables by destination. *Mackie v. Smith*, 5 La.Ann. 717 (1850); *Gauche Realty Co. v. Janssen*, 158 La. 379, 104 So. 122 (1925). The key factor in such a determination would seem to have been the degree of permanence, for in *Kelieher v. Gravois*, 26 So.2d 304 (La.Ct.App.Orl.1946), venetian blinds were found not to be immovable by destination inasmuch as their manner of attachment was only temporary, designed for the personal use of the occupant, and not for the improvement of the building itself.

However, to become immobilized a thing must have been attached to the real estate by the owner thereof. That is, there must have been unity of ownership between the movable and the immovable. *See, e.g., Edwards v. S & R Gas Co., Inc.*, 73 So.2d 590 (La.App. 2d Cir.1954), wherein a butane gas tank remained a movable, the property of the gas company, even though the immovable property was sold to another. Thus,

---

**6.** Article 464
    Land and buildings or other constructions, whether they have their foundations in the soil or not, are immovable by their nature.
Article 467
    Wire screens, water pipes, gas pipes, sewerage pipes, heating pipes, radiators, electric wires, electric and gas lighting fixtures, bathtubs, lavatories, closets, sinks, gasplants, meters and electric light plants, heating plants and furnaces, when actually connected with or attached to the building by the owner for the use or convenience of the building are immovable by their nature.
Article 468
    Things which the owner of a tract of land has placed upon it for its service and improvement are immovable by destination. Thus the following things are immovable by destination when they have been placed by the owner for the service and improvement of a tract of land, to wit: Cattle intended for cultivation. Implements of husbandry. Seeds, plants, fodder, and manure. Pigeons in a pigeon house. Beehives. Mills, kettles, alembics, vats, and other machinery made use of in carrying on the plantation works. The utensils necessary for working cotton, and sawmills, taffia distilleries, sugar refineries and other manufactures.
Article 469
    The owner is supposed to have attached to his tenement or building forever such movables as are affixed to the same with plaster, or mortar, or such as can not be taken off without being broken or injured, or without breaking or injuring the part of the building to which they are attached.

**7.** *See*, La.Civ.Code Art. 466, Comment (e).

**8.** *Lafleur* was the only case cited by the court in *Equibank*, and undoubtedly served as the basis for the reference to societal expectations in the classification of the things as movable or immovable.

in *Folse v. Loreauville Sugar Factory*, 156 So. 667 (La.App. 1st Cir.1934), machinery which had been installed in a sugar factory by persons other than the owner remained movable even after a sale of the factory purporting to convey the equipment.

As the court in *Folse* noted, however, the equipment would have become immovable had the owner of the property exercised his rights under the accession rules of the Louisiana Civil Code. At that time, La.Civ. Code Art. 508 provided as follows:

> When plantations, constructions and works have been made by a third person, and with such person's own materials, the owner of the soil has a right to keep them or to compel this person to take away or demolish the same.
>
> If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.
>
> If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby.
>
> Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owner shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil.

Accordingly, by virtue of accession, the ownership of the thing could become unitary, and the thing would be an immovable. However, without such accession, the item would remain a movable and ownership would not pass to a purchaser.

Applying this body of law to the facts at hand, it is evident that the electrical transformers would fall into the category of immovables by nature. They can easily be classified as such by virtue of former Article 467, which specifies that "... electric wires, electric and gas lighting fixtures ... and electric light plants" are immovables by nature when attached to the building for the use or convenience of the building. Of course, the secondary requirement of the unity of ownership must have been met. Since there is no evidence in the record that the Jackson Brewing Company ever exercised its options pursuant to the accession articles, the *Folse* reasoning would apply. Hence, in 1978, when the brewery building was sold to the American Can Company, the transformers remained movables and were the property of NOPSI.

The next level of inquiry is to ascertain whether the transformers remained classified as movables following the 1978 revision in the law. As mentioned above, this revision eliminated the requirement of unity of ownership and obliterated the distinctions between a thing which is immovable by nature and one which is immovable by destination. Under the present law, the only relevant consideration is whether the item is a component part of the immovable pursuant to Article 466. Thus, we must apply the five factors discussed in *Equibank* and mentioned above.

*First.* To have been an immovable, the transformers must have been a component part of an immovable, specifically the brewery building.

*Second.* To have been a component part of the brewery building, the transformers must have been permanently attached to it as a matter of fact. Although bolted to the floor and connected to the electrical system of the building, the record reflects that the transformers were easily disconnected and removed from the structure with only a minimal amount of damage to the building. As the administrative law judge below noted, although a transformer was damaged during its removal, this was a function of the method of removal rather than an indigenous aspect of removal. Hence, the second paragraph of Article 466 is inapplicable, the transformer not being "perma-

nently attached" within the meaning of that section.

*Third.* However, as a matter of law, certain items are deemed to be permanently attached if they are so classified in the first paragraph of Article 466, regardless of the actual degree of permanent attachment. One of the categories so enumerated is "electrical installations." While it might seem that a transformer would certainly be an electrical installation, resort must be made to societal notions of what an electrical installation is.

*Fourth.* The ALJ, in reviewing these factors, felt that as there was no evidence presented regarding societal notions of the nature of electrical transformers, he would consider the views of the parties. Since Jackson Brewery regarded the transformers as belonging to NOPSI, and NOPSI was, the ALJ felt, ambivalent as to their ownership, the transformers were immovables. Such reasoning is flawed.

The relevant inquiry in this phase is not whether society views electrical transformers as *immovables,* but whether society views them as *electrical installations.* If the latter is found, then the Code not societal expectations determines whether they are immovables. Furthermore, the *parties'* views—or more aptly, their treatment of the electrical installation—are of no moment in such a determination. If the transformers are component parts under the codal analysis, the parties cannot obviate the law by their own treatment of an item, no matter how sincere. Thus, the ALJ erred in considering the expectations or opinions of the parties in an analysis of Article 466. No authority was cited for such a proposition, and indeed we have found none.

If the parties did not desire to have the transformers become component parts, then they could have taken specific, legal steps to insure such a result. In such a circumstance, the intent of the parties would be relevant. There are a number of ways by which a thing, although normally a component part and hence an immovable, can remain a movable. For instance, La. R.S. 9:5357 provides that a movable subject

to a chattel mortgage remains a movable, even when attached to an immovable. Further, attachments made pursuant to a servitude or lease are likewise governed by considerations which can undermine an analysis under Article 466. *See, e.g.,* La. Civ.Code. Art. 495.

Finally, the fact that no specific evidence was presented as to how society would view these electrical transformers is not fatal to analysis under this factor. Indeed, no such evidence was present in *Equibank.* It would be absurd to require such testimony. Rather, such a determination can, and should be made by the trier of fact on a case by case basis. In the present case, the ALJ did not make such a determination. However, we feel that on the facts present in the record there can be no serious question that electrical transformers were electrical installations within the meaning of Article 466, and that society would view them as such.

*Fifth.* The last factor to be reviewed is the degree of skill required to connect or disconnect the transformers. This factor places emphasis not so much on whether the item is electrical in nature, but on the degree or manner in which it is installed. In this sense, it is distinguishable from the fourth factor which emphasizes the inherent nature of an item. The court in *Equibank* articulated this distinction in terms of a comparison between such items as a can opener and a hot water heater. While both are indisputably electrical appliances, the former is not "installed" within the meaning of Article 466; whereas, the latter is. Again, societal views determine whether a thing is installed, based upon factors such as the ease with which it may be connected or disconnected. Although the *Equibank* test was predicated on a residential setting, the same considerations would apply in a commercial or industrial situation.

Of course, what might constitute an installation in a residential setting might not necessarily be so in an industrial setting. Although we would imagine that a chandelier in an office would be just as much an immovable as one in a residence, there may be circumstances where a direct compari-

son is not appropriate, or even possible. For instance, we cannot imagine a home, even one on St. Charles Avenue, having a 5000 pound transformer in the living room. Quite simply, each factual scenario must be resolved on its own, with reference made to the relevant societal expectations.

In light of these considerations, we have no doubt that these transformers were "installed" within the meaning of Article 466.

## CONCLUSION

Based on a review of the foregoing factors, we conclude that the electrical transformers were electrical installations, hence they were component parts of the brewery building, and were therefore immovables. Thus, after the effective date of Article 466, the transformers became the property of the owner of the brewery building, which was then the American Can Company, by virtue of being component parts of the building pursuant to La.Civ. Code Article 466.

When American Can Company sold the brewery building to Jackson Square Investment, Ltd. in 1982, ownership of the three 1250 KVA transformers passed to that company. Such a conclusion is inescapably dictated by the application of Article 466 and the *Equibank* analysis. We also note that, almost forgotten in this litigation has been the fate of the five other transformers, installed by the Jackson Brewing Company and located in the same room as the three which had been installed by NOPSI. Ownership of these transformers indisputably passed to the successive owners of the building. Of course, since they were placed in the building by the owner, they would have been immovables even under the prior law.

■ We also note the fact that this dispute arises in somewhat of a unique posture. In the typical scenario, the various parties are attempting to claim ownership of an item rather than dispute it. Had these transformers been of value to NOPSI rather than useless, pollution filled relics, we suspect that NOPSI would have argued a position contrary to that which they have herein advanced. The conclusion would

have been the same, however. Once an item has been attached to an immovable in such a manner as to make it a component part of the immovable, absent one of the overriding mechanisms discussed above, the ownership of the thing passes to the owner of the immovable. Naturally, however, in such a circumstance there are rights provided to the prior owner of a thing pursuant to the present Louisiana Civil Code Article 493.2 *et seq.* and the law of accession. *See generally,* Comment, *Artificial Accession to Immovables,* 55 Tul. Law.Rev. 148 (1980).

In accordance with the foregoing reasons, the judgment of the administrative law judge is REVERSED, and the penalty assessed against NOPSI is vacated, as they were not the owners of the transformers at the time of the pollution.