United States Court of Appeals,

Fifth Circuit.

No. 92-7756.

MATAGORDA COUNTY, Bay City Independent School District and City of Bay City, Plaintiffs-Appellants,

v.

RUSSELL LAW and Federal Deposit Insurance Corporation, as Receiver for Bay City Bank & Trust Co., Defendants-Appellees.

April 21, 1994.

Appeal from the United States District Court for the Southern District of Texas.

Before POLITZ, Chief Judge, HIGGINBOTHAM, Circuit Judge and PICKERING[*], District Judge.

PICKERING, District Judge:

This case presents the issue of whether a lien interest held by the FDIC can be extinguished without the FDIC's consent as a result of foreclosure of liens securing the payment of local property taxes. The FDIC contends, and the district court below held, that 12 U.S.C. § 1825(b)(2), recently enacted as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), expressly requires protection of the FDIC's interest.

In 1987, Bay City Bank & Trust Company acquired a lien on several lots in Bay City, Texas, under a deed of trust executed by Russell Law given to secure repayment of a $1,100,000 loan. In August 1990 Bay City Bank was declared insolvent by the Texas State

[*]District Judge of the Southern District of Mississippi, sitting by designation.

1

Banking Commissioner and the FDIC was appointed receiver and succeeded to Bay City's lien interest in the subject property. In September 1991, Matagorda County, Bay City Independent School District and the City of Bay City (the Taxing Units) sued Russell Law and Bay City Bank in state court to recover delinquent *ad valorem* property taxes, penalties, interest, attorney's fees and other costs for the years 1988 through 1990 on the subject property. The Taxing Units joined the FDIC as a defendant in the state court action in January 1992, and the FDIC removed the case to the district court in March 1992. The Taxing Units sought a personal judgment against Russell Law for the taxes and penalties, and foreclosure of the Taxing Units' lien without the permission of the FDIC and without preserving the lien the FDIC had acquired from Bay City.

The court below entered summary judgment against Russell Law and in favor of the Taxing Units in the amount of $51,899.01 for delinquent taxes, penalties and interest and decreed the existence of a lien to secure that sum. The court in its well-reasoned opinion further held that this lien "is prior and superior to all claims, rights, title, interest, or liens asserted by all of the parties Defendant herein", but then denied foreclosure of that lien absent consent of the FDIC, requiring that any foreclosure be subject to the FDIC's lien. It is from this ruling that the Taxing Units have perfected their appeal.

*STANDARD OF REVIEW*

This Court reviews a grant of summary judgment *de novo. Hanks*

*v. Transcontinental Gas Pipeline Corp.,* 953 F.2d 996, 997 (5th Cir.1992).  "In reviewing the summary judgment, we apply the same standard of review as did the district court."  *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989).  Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Federal Rules of Civil Procedure 56(c).  *Sims v. Monumental General Ins. Co.,* 960 F.2d 478, 479 (5th Cir.1992).  The pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, must demonstrate that no genuine issue of material fact remains. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  To that end we must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).  If the record taken as a whole cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

We review the district court's legal decisions, including the proper interpretation of a statute, *de novo.*  *AFCO Steel, Inc. v. TOBI Engineering, Inc.,* 893 F.2d 92, 93 (5th Cir.1990).

*TAX LIENS UNDER TEXAS LAW*

Under Texas law, assessed but unpaid taxes on real property become a lien on the property on January 1 of the year for which

they are levied.  TEX.PROP.TAX CODE ANN. § 32.01 (Vernon 1992). This lien has priority over any preexisting or subsequently imposed lien.  TEX.PROP.TAX CODE ANN. § 32.05 (Vernon 1992).  The taxes become delinquent if not paid prior to February 1 of the year following the year in which they were imposed.  TEX.PROP.TAX CODE ANN. § 31.02 (Vernon 1992).  At any time after its tax on property becomes delinquent, a taxing unit may file suit to foreclose the lien securing payment of the tax, to enforce personal liability for the tax, or both.  TEX.PROP.TAX CODE ANN. § 33.41(a) (Vernon 1992). Property seized or ordered sold pursuant to foreclosure of a tax lien is subject to sale to the highest bidder at a tax sale, subject only to the owner's right of redemption and certain covenants and easements running with the land which were recorded prior to January 1 of the year the tax lien arose.  TEX.PROP.TAX CODE ANN. § 34.01 (Vernon 1992).  The owner of real property sold at a tax sale may redeem the property within two years after the date on which the purchaser's deed is filed for record.[1] TEX.PROP.TAX CODE ANN. § 34.21 (Vernon 1992).

A tax lien on real property in Texas secures four different components:

(1) the tax itself;

(2) a one time penalty of twelve percent (12%) if the tax is not paid by July 1 of the year in which it becomes delinquent,

---

[1]The redemption period for certain classes of property not homestead or designated for agricultural use was reduced to six months by the 1993 session of the Texas Legislature by way of a constitutional amendment to be acted upon by the citizens of Texas.  For purposes of this action, the outcome of the vote on that amendment is of no consequence.

TEX.PROP.TAX CODE ANN. § 33.01(a) (Vernon 1982);

(3) interest at the rate of one percent (1%) per month until the tax is paid "to compensate the taxing unit for revenue lost because of the delinquency", TEX.PROP.TAX CODE ANN. § 33.01(c) (Vernon Supp.1992);  and

(4) an amount not to exceed fifteen percent (15%) of the total tax, the twelve percent (12%) penalty, and the interest of one percent per month, this being "an additional penalty to defray costs of collection", and which precludes the recovery of an attorney's fee in a suit brought to collect delinquent taxes. TEX.PROP.TAX CODE ANN. § 33.07 (Vernon 1982).

*PRIORITY OF TAXING UNITS' LIEN VERSUS THE FDIC'S LIEN*

Appellants strenuously argue that their ad valorem tax lien is superior to the consensual mortgage lien acquired by the FDIC. Indeed, the court below held that appellants' lien, "... is prior and superior to all claims, rights, title, interest, or liens asserted by all of the parties Defendant herein."  However, the *priority* of the relative liens is not the determinative question to be addressed.  The decisive question is whether or not the court below was correct in ruling that the appellants' *ad valorem* tax lien could not be *foreclosed* without the permission of the FDIC, regardless of the relative priority of the liens.

*FIRREA*

The Federal Deposit Insurance Corporation, when acting in its capacity as a receiver, is exempted from the extinguishment of its property interests through sale, *foreclosure* or levy, unless it has given its consent.  12 U.S.C. § 1825(b)(2) provides;

No property of the Corporation shall be subject to levy, attachment, garnishment, foreclosure or sale without the consent of the corporation, nor shall any involuntary lien attach to the property of the corporation.

Subsection (b) of § 1825 was adopted by Congress in the

5

Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183, which became effective on August 9, 1989. FIRREA was enacted in response to the national crisis involving failed financial institutions. Its purpose was, among other things, to strengthen enforcement powers of federal regulators of depository institutions. FIRREA § 101, *Reprinted* in 1989 USCCAN (103 Stat.) 187.

The 1989 passage of 12 U.S.C. § 1825 extended the FDIC's immunity from state taxation, previously limited to its corporate function, to its role as receiver. *Irving Independent School Dist. v. Packard Properties,* 970 F.2d 58, 61 (5th Cir.1992). As this Court recognized in *Irving.* "The result of § 1825(b)(2) is that liens may not attach to that property while the FDIC owns it, but a property previously encumbered must remain so." *Irving Independent School Dist. v. Packard Properties,* 970 F.2d at 61. We went on to assert in *Irving;*

> The FDIC enjoyed sovereign immunity from state tax penalties to facilitate its reconsolidation of failed banks; in addition to the constitutional requirements, an admirable goal underlies that immunity. Whenever the FDIC can reduce the charges connected to property it has acquired, it can increase the value of the property, decrease its own losses, expedite resale, and save the nation's taxpayers and insured depositors a great deal of money. The ability to extinguish liens securing unpaid tax penalties incurred by earlier owners would certainly further these goals. But to endow the FDIC with such a valuable tool would come at a great cost to state and local taxing authorities. Using this case as an example, local governments and school districts have operated with reliance on the recovery of unpaid ad valorem taxes and penalties through liens on real property. To deny them their justified expectations of receiving those funds would threaten their ability to operate their schools. The policy arguments in this case are strong on both sides. Perhaps in consideration of these countervailing interests, Congress limited its grant of power to the FDIC.

6

*Irving Independent School Dist. v. Packard Properties,* 970 F.2d at 62-63.

*LOCAL AND STATE TAXES IMPOSED ON PROPERTY OF THE UNITED STATES*

It is well established that "a state may not, consistent with the Supremacy Clause, U.S. Const., Art. VI, Cl. 2, lay a tax "directly upon the United States.' " *Irving Independent School Dist. v. Packard Properties,* 970 F.2d at 61; *quoting, U.S. v. New Mexico,* 455 U.S. 720, 733, 102 S.Ct. 1373, 1382, 71 L.Ed.2d 580 (1982), and *Mayo v. U.S.,* 319 U.S. 441, 447, 63 S.Ct. 1137, 1140, 87 L.Ed.2d 1504 (1943). "No state or county can tax the property interest of the United States in the absence of Congressional consent." *U.S. v. Allegheny County, PA,* 322 U.S. 174, 191, 64 S.Ct. 908, 917-18, 88 L.Ed. 1209 (1944). "There is no constitutional prohibition against a state or county assessing taxes against property on which the United States holds a lien on the basis of the full value of that property, but, in the absence of Congressional consent the state or county is without authority to enforce the collection of the taxes thus assessed so as to destroy the pre-existing federal lien." *City of New Brunswick v. United States,* 276 U.S. 547, 556, 48 S.Ct. 371, 372-73, 72 L.Ed. 693 (1928); *S.R.A., Inc. v. State of Minnesota,* 327 U.S. 558, 569, 66 S.Ct. 749, 756, 90 L.Ed. 851 (1946).

*THE FDIC's TAX POLICY STATEMENT*

The FDIC contends that the central issue to be reviewed by this Court is a purely legal one—interpretation of 12 U.S.C. § 1825(b)(2). The FDIC further asserts that the standard of review

7

is potentially affected by the fact that it has already interpreted this statute in its Tax Policy Statement and accompanying Legal Memorandum. FDIC's position is that should this Court agree with the District Court that the statute is clear on its face, the FDIC's interpretation will have no effect on the outcome of the case. Appellee-FDIC stresses that should the Court conclude that the statute is unclear however, the FDIC's interpretation should be accorded deference under the well-established doctrine that an agency's interpretation must be accepted if it reflects a plausible construction of the statute and does not otherwise conflict with Congress' expressed intent. *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984); *Sybrandy v. U.S. Dept. of Agriculture, Agr. Stabilization and Conservation Service,* 937 F.2d 443, 446 (9th Cir.1991); *Resolution Trust Corp. v. CedarMinn Bldg. Ltd. Partnership,* 956 F.2d 1446, 1450-51 (8th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992).

This Court has previously addressed the FDIC's Tax Policy Statement and Accompanying Legal Memorandum in *Irving Independent School Dist. v. Packard Properties, supra.* In *Irving,* this Court declined to accord deference to the FDIC's Tax Policy Statement and Legal Memorandum because it found that the statute at issue in that case, § 1825(b)(3), clearly compelled an interpretation different from the FDIC's. The Court went further and explained,

8

> We conclude that the FDIC's Legal Memorandum should be given no deference, not only because of the clarity of the federal statute but because the Memorandum's strategically timed publication—especially when the statutory language is clear—imprints its contents with the stamp of biased opportunism.

*Irving Independent School Dist. v. Packard Properties,* 970 F.2d at 64.

In response the FDIC stresses that this case is unlike the facts addressed by the Court in *Irving.* The FDIC asserts that several courts in addition to the District Court below have agreed with the FDIC's interpretation of § 1825(b)(2). The FDIC points out that in *Irving,* the Court declined to defer to the FDIC's interpretation of § 1825(b)(3) on the ground that it was issued "during pending litigation." The FDIC points out that the Tax Policy Statement and underlying Legal Memorandum were issued three months before the Taxing Units filed suit herein and six months before the FDIC was made a party to this suit.

The FDIC's Tax Policy Statement was formally adopted by the FDIC's board of directors and is published at 1 *FDIC, Law, Regulations and Related Acts (FDIC),* 5331. The Legal Memorandum which accompanied the Tax Policy Statement, and which was also adopted by the FDIC board, is published at Fed.Banking L.Rep. (CCH), Paragraph 81,426. The 1991 Tax Policy Statement replaced an interim Tax Policy Statement that had been issued on July 12, 1990, almost one year earlier. The 1991 Tax Policy Statement adopted exactly the same interpretation of § 1825(b)(2) as set forth in the interim policy statement. That interpretation was accepted by the Court below. Thus appellee argues that its interpretation of §

1825(b)(2) is not merely a convenient litigating position as was criticized by this Court in *Irving,* but instead reflects consistent administrative practice entitled to judicial deference.

The entire argument of whether or not the Tax Policy Statement issued by the FDIC is entitled to deference or not hinges on this Court's finding of whether or not the statute at issue, § 1825(b)(2), is ambiguous. "A court may discount the FDIC's Legal Memorandum when reliance upon an agency interpretation is unnecessary because the statutory language the agency interprets is unambiguous." *Irving Independent School Dist. v. Packard Properties,* 970 F.2d at 63.

Section 1825(b)(2) says no "property" of the corporation shall be subject to levy, attachment, garnishment, *foreclosure,* or sale without the consent of the corporation.[2] (Emphasis added.) "If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 842-43, 104 S.Ct. at 2781-2782. "It is axiomatic that "[t]he starting point in every case involving construction of a statute is the language itself.' " *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); *quoting Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). This Court has previously ruled that Congressional intent, as codified in § 1825, is clear and

_____

[2]12 U.S.C. § 1825(b)(2).

10

unambiguous and that there was no need for an extraneous interpretation of the FDIC's Tax Policy Statement nor its accompanying Legal Memorandum. *See Irving Independent School Dist. v. Packard Properties, supra.* The clear language of the statute has become no less clear since *Irving.*

*IS THE FDIC ACQUIRED LIEN A "PROPERTY INTEREST"?*

The operation of § 1825(b)(2) is limited to "property" of the corporation.[3] Appellants Taxing Units contend that this Court should rely on Texas State law for a determination of whether or not the consensual mortgage lien acquired by the FDIC is a "property" interest as contemplated in § 1825. As a first line of support, the appellants cite several Texas cases which hold that consensual mortgage liens are not "property" under Texas law. Appellants assert that Texas law is controlling in determining what the FDIC holds as the successor beneficiary of the consensual deed of trust lien created on the Law lots. They further contend that the FDIC does not possess an interest in the property nor is it a property owner. Under Texas law, a lienholder does not have legal title to the property on which he holds the lien. *First Nat. Bank of Bellaire v. Huffman Independent School Dist.,* 770 S.W.2d 571, 573 (Tex.App.—Houston [14th Dist.] 1989, writ denied), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 967 (1990). Appellants thus argue that if the FDIC does not have legal title,

---

[3] "No property of the Corporation shall be subject to levy, attachment, garnishment, foreclosure or sale without the consent of the corporation, nor shall any involuntary lien attach to the property of the corporation." 12 U.S.C. § 1825(b)(2).

11

then it has no property interest. *See Birdville Independent School Dist. v. Hurst Associates,* 806 F.Supp. 122, 127 (N.D.Tex.1992). However, Texas law does recognize that lienholders have an equitable interest in the secured property. *E.g., Flag-Redfern Oil Co. v. Humble Exploration Co., Inc.,* 744 S.W.2d 6, 8 (Tex.1987). Additionally, at least one Texas Court has found that an FDIC acquired lien is "property" under § 1825. *See State v. Bankerd,* 838 S.W.2d 639, 641 (Tex.App.—San Antonio 1992, writ denied).

However, the definition of "property" in this case is governed by federal law. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366-67, 63 S.Ct. 573, 574-75, 87 L.Ed. 838 (1943). It has been settled federal law since 1928 that in the context addressed herein, "property" embraces both fee and lien interests. *See, Clallam Co., Wash. v. U.S.,* 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (1923); *City of New Brunswick v. United States,* 276 U.S. 547, 48 S.Ct. 374, 71 L.Ed. 693 (1928); *U.S. v. Roessling,* 280 F.2d 933, 936 (5th Cir.1960); *Rust v. Johnson,* 597 F.2d 174 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 450, 62 L.Ed.2d 376 (1979); *U.S. v. General Douglas MacArthur Senior Village, Inc.,* 470 F.2d 675, 680 (2nd Cir.1972), *cert. denied,* sub nom., *County of Nassau v. U.S.,* 412 U.S. 922, 93 S.Ct. 2732, 37 L.Ed.2d 149 (1973); *U.S. v. Richland County,* 500 F.Supp. 312, 316-317 (D.S.C.1980); *U.S. v. Emergency Land Fund, Inc.,* 569 F.Supp. 62, 65 (S.D.Miss.1983), *aff'd.,* 738 F.2d 434 (5th Cir.1984). "No basis in law exists for treating mortgage interests of federal instrumentalities differently from other property of the United States." *Rust v.*

12

*Johnson,* 597 F.2d at 177;  *citing City of New Brunswick v. United States, supra;*  and *U.S. v. Roessling,* 280 F.2d at 936.

Appellants next argue that 28 U.S.C. § 2410 controls the outcome of this case.  That statute addresses suits naming the United States as a party in a civil action "... to foreclose a mortgage or other lien upon ... property on which the United States has or claims a mortgage or other lien."  28 U.S.C. § 2410(a).  In such a suit, "[a] judgment or decree ... shall have the same effect respecting the discharge of the property or other lien held by the United States as may be provided with respect to such matters by the local law of the place where the court is situated."  If § 2410 applies, the Taxing Units' prior lien would extinguish the junior FDIC lien.

Section 2410, which substantially predates FIRREA, was enacted in 1931 to "lift the bar of sovereign immunity which had theretofore been considered to work a particular injustice to private lienors."  *U.S. v. Brosnan,* 363 U.S. 237, 246, 80 S.Ct. 1108, 1114, 4 L.Ed.2d 1192 (1960).  FIRREA, on the other hand, is a comprehensive system of statutes enacted fifty-eight years later to address a crisis in the financial institutions industry.  Section 1825 was enacted to protect assets involuntarily acquired by the FDIC from losing value because of its lack of knowledge about local and state tax liens.  Section 2410 is not mentioned in FIRREA, and to the extent that it is inconsistent with that statute, it does not control, since more specific and recent statutes prevail over more general older ones absent a clear

13

intention otherwise. *See, e.g., Morton v. Mancari,* 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974); *U.S. v. Crittenden,* 600 F.2d 478, 480 (5th Cir.1979); *Sam Bassett Lumber Co. v. City of Houston,* 145 Tex. 492, 198 S.W.2d 879, 881 (1947). Section 1825 is clearly a later, more specific statute designed and enacted to protect assets acquired by the FDIC in its efforts to strengthen the banking industry.

The Taxing Units cite two cases applying state law to divest federal liens under § 2410. *U.S. v. Brosnan, supra;* and *U.S. v. Cless,* 254 F.2d 590 (3rd Cir.1958). However, both of those cases recognized that divestiture was proper only if Congress had not acted to prevent it. *Brosnan,* 363 U.S. at 241, 242, 80 S.Ct. at 1111, 1112; *Cless,* 254 F.2d at 594. Congressional action pursuant to the enactment of § 1825 of FIRREA defeats the operation of § 2410 in this case.

The appellants next argue that federal common law, as developed from state law, controls. For this proposition, Appellants rely on *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *Kimbell Foods* held, "We conclude that the source of law is federal, but that a national rule is unnecessary to protect the federal interest underlying the loan programs. Accordingly we adopt state law as the appropriate federal rule for establishing the relative priority of these competing federal and private liens." *U.S. v. Kimbell Foods, Inc.,* 440 U.S. at 718, 99 S.Ct. at 1453. The holding of *Kimbell Foods* would seem to support the appellants' position. However, that case

14

contains this caveat: "Thus, the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *U.S. v. Kimbell Foods, Inc.,* 440 U.S. at 740, 99 S.Ct. at 1464. Appellants ignore the holding in *Kimbell Foods,* "... that *absent a Congressional directive,* the relative *priority* of private liens and consensual liens arising from these government lending programs is to be determined under non-discriminatory state laws." 440 U.S. at 740, 99 S.Ct. at 1465. (Emphasis added.) In the situation presented to the Court in the case at bar, there has been direct Congressional action by virtue of 12 U.S.C. § 1825(b)(2)—not concerning the priority of the relative liens—but dealing with a taxing unit's ability to *enforce* that lien absent FDIC consent. As the Ninth Circuit stated in *Rust,* "Appellants' contention confuses validity and priority of the lien with the real issue in this lawsuit. We are not concerned with authority of the city to make the assessment or with the priority under state law of the street improvement lien.... What we have decided is that under federal law the improvement lien cannot be enforced without protecting the federal interest." *Rust v. Johnson,* 597 F.2d at 180.

As pointed out previously, appellants seem to be operating under the same misapprehension as was the City of Los Angeles in *Rust.* The FDIC has not contested the Taxing Units' authority to assess the taxes against the Law property nor the validity or *priority* of their subsequently imposed lien for the failure to pay taxes. The FDIC's only contention is that the tax lien cannot be

15

foreclosed so as to extinguish its (the FDIC's) interest in the property unless it (the FDIC) consents. The FDIC's acquired lien interest in the Law lots is clearly a "property" interest as contemplated in the statute.[4]

Appellants' other arguments regarding the Legislative history and the asserted retroactive application of the statute are without merit. The fact that this suit relied on events occurring before the 1989 enactment of FIRREA does not make its application retroactive. *See U.S.E.P.A. v. New Orleans Public Service, Inc.,* 826 F.2d 361, 365 (5th Cir.1987). The Taxing Units' suit to foreclose their tax lien is the triggering event that is prohibited by FIRREA—specifically by § 1825(b)(2). For purposes of the prohibition contained in the statute, it does not matter when the lien came into existence, the attempted enforcement occurred in 1991. *See GWN Petroleum Corp. v. OK-Tex Oil & Gas, Inc.,* 998 F.2d 853 (10th Cir.1993).

If the taxing units were allowed to foreclose their tax lien without the consent of the FDIC, the consensual mortgage lien executed by Law and acquired by the FDIC as a result of the failure of Bay City Savings Bank would be extinguished. This is clearly forbidden by the plain wording of § 1825(b)(2). Again, this appeal does not involve the priority of the liens involved, it only involves the question of when and how the foreclosure can be conducted.

*THE "TAKINGS CLAUSE"*

---

[4]12 U.S.C. § 1825(b)(2).

The final point of error asserted by the Taxing Units is that the district court erred in holding that 12 U.S.C. § 1825 prohibits a foreclosure of the *ad valorem* tax lien without awarding the Taxing Units recovery against the FDIC for the amount of the value secured by the tax lien.[5]  In other words, the FDIC has effectively "taken" the property of the Taxing Units (the value secured by the tax lien) without just compensation as required by the United States Constitution.[6]

The FDIC contends that the application of § 1825 to protect its lien interest from foreclosure is not a compensable taking under the Fifth Amendment because all the statute requires is that the FDIC lien be protected.  It does not extinguish the Taxing Units' lien nor does it even subordinate it to the FDIC lien—it

_____

[5]The FDIC argues that there can be no "taking" by virtue of the Constitution's Supremacy Clause, because, absent express Congressional waiver, a local taxing authority could never enforce a tax lien so as to destroy a federal lien interest. *E.g., Clallam County,* 263 U.S. at 344, 44 S.Ct. at 121-22;  *New Brunswick,* 276 U.S. at 556, 48 S.Ct. at 372-73;  *U.S. v. Roessling,* 280 F.2d at 936;  *Rust v. Johnson,* 597 F.2d at 178-79. Since 12 U.S.C. § 1825(b)(1) provides that State and local governments may impose real property taxes on property acquired by the FDIC, there has been an "express Congressional waiver" of the Supremacy Clause.  Thus, the FDIC's Supremacy Clause argument is not entirely relevant, except for historical purposes.

[6]The relevant portion of the Fifth Amendment to the United States Constitution provides that, "... nor shall private property be taken for public use, without just compensation." Although the language of the "Takings Clause" is couched in terms of "private property", it is recognized that the "Takings Clause" also applies to "independently held and controlled property of a state or of a local subdivision...."  *U.S. v. Carmack,* 329 U.S. 230, 242, 67 S.Ct. 252, 257, 91 L.Ed.2d 209, 217 (1946);  *See also, U.S. v. 50 Acres of Land,* 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984).

merely delays its enforcement.[7] Appellants counter that it is this indeterminate delay that constitutes a compensable taking.

While eschewing any " "set formula' for determining when "justice and fairness' require that economic injuries caused by public action be compensated by the government,"[8] the Supreme Court has identified three factors that have "particular significance."[9] They are;  (1) the economic impact of the regulation on the claimant;  (2) the extent to which the regulation has interfered with distinct investment-backed expectations;  and, (3) the character of the governmental action.[10]

The first significant factor is the economic impact of § 1825 on the Appellants.  In order for regulatory action to rise to the level of an unconstitutional taking, there must be a complete deprivation of the owner's economically viable use of his property. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 138, n. 36, 98 S.Ct. 2646, 2666, n. 36, 57 L.Ed.2d 631, 657 (1978); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112;  and *Lucas v. South Carolina Coastal Council,*

---

[7]The FDIC points out that under its interpretation of § 1825(b)(2), the Taxing Units can foreclose their lien, as long as the FDIC lien is protected;  that the FDIC has stated that it will provide for payment of delinquent taxes on property in which it holds an interest;  and that tax liens having priority over the FDIC's mortgage liens under state law will be recognized.

[8]*Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978).

[9]*Id.*

[10]*Id.  See also, Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166, 179 (1986).

18

--- U.S. ----, ----, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 813 (1992). Where virtually all of the owner's possessory rights are left intact, the interference cannot be a taking. *Penn Cent.,* 438 U.S. at 130-31, 98 S.Ct. at 2662-63. As the Supreme Court has stated, "where an owner possesses a full "bundle' of property rights, the destruction of one "strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard,* 444 U.S. 51, 65-66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979). Both parties analogize to the "bundle" of rights. The FDIC contends that the Taxing Units' property interest is to the taxes due on the property which secures the tax lien and the mortgage lien. That property interest includes a bundle of rights including the power to assess and levy taxes, assess penalties, to foreclose on tax liens, and to obtain personal judgments against landowners. All of this bundle remains after the application of FIRREA except the right to foreclose. As long as some strands remain in the bundle, the fact that the Taxing Units suffer economic loss does not create a taking. *See Penn Cent. Transp. Co. v. City of New York, supra.* The Taxing Units assert that the tax lien itself is the affected property right. They argue that the FDIC's power to delay foreclosure makes the entire lien worthless for the period of delay and further, may make the entire lien completely worthless when it does finally give its consent if the accumulation of debt (interest) on the property makes it unmarketable. Thus, the ultimate question confronting the Court is whether or not a delay in allowing the Taxing Units to

19

foreclose their lien constitutes a taking. The Taxing Units have cited no cases which hold that mere delay in exercising a property right is a compensable taking. The main case relied upon by the Appellants is *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). However, *Louisville* dealt not only with delay but also with a bankruptcy provision which allowed the underlying debt to be written down. Under § 1825, the FDIC does not have the power to change the amount of taxes due—nor does it prevent the Taxing Units pursuing collection of their personal judgment against the landowner, Russell Law. While the operation of § 1825 creates a delay which impairs the ability of the Taxing Units to collect on their tax lien, mere delay—at least the period of delay experienced to this point—does not infringe on Appellants' total "bundle" of rights to the point of creating a compensable taking.

The Taxing Units concede that they may not have the same type of investment-backed expectations present in a traditional analysis of the next prong of the tri-partite test, but they argue that they certainly expected to be able to collect the delinquent taxes owed to them or to be able to foreclose on the underlying security and sell it in order to recover the unpaid taxes, penalties and interest. The Taxing Units have relied on the fact that their lien generally takes priority over all other liens, and indeed it still has priority over the FDIC acquired lien. However, the Taxing Units routinely deal with banks holding security instruments on real property and must recognize that, "Banking is one of the

longest regulated and most closely supervised of public callings." *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947). Those who deal with regulated industries are charged with notice that Congress may enact legislation to meet a given legislative goal. *See Connolly, supra;* and *McAndrews v. Fleet Bank of Massachusetts, N.A.,* 989 F.2d 13 (1st Cir.1993). Regardless of the foregoing, prior to the 1989 enactment of FIRREA, Appellants would have likely been entitled to enforcement of their tax lien irrespective of who held the mortgage lien. This factor tends to militate in favor of finding a taking but for the fact that in the final analysis, FIRREA has not ultimately deprived the Appellants of the essence of their claim—it has merely delayed enforcement of that claim.

With respect to the final significant factor, the character of the governmental action, the FDIC has not physically invaded or permanently appropriated any assets belonging to the Taxing Units for its own use. "It is well settled that a " "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.' ... While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, ... the Court has repeatedly upheld regulations that ... adversely affect real property interest." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488, n. 18, 107 S.Ct. 1232, 1243, n.

18, 94 L.Ed.2d 472 (1987). The indeterminate postponement of the Taxing Units' ability to collect on their tax lien, while not a "physical invasion" or a "permanent appropriation" of their assets, is certainly a severe impairment of those assets. The Taxing Units make a persuasive argument that their ongoing viability—the ability to provide necessary community services, schools, fire and police protection, etc.—are greatly compromised by their inability to collect delinquent taxes. This argument does not fall on deaf ears.

After a careful analysis of all of the facts of this case, this Court is not convinced that the Appellants have been deprived of a sufficient property interest to create a compensable taking.[11]

---

[11]The Court would note that the court below authorized the Taxing Units to foreclose on the property in question provided the lien of the FDIC is preserved. That is not a realistic solution. As the record indicates, when the final judgment was entered in the trial court below on November 10, 1992, the adjudged value of the lots was only $333,660. The last unpaid balance of the Russell Law note appearing in the record was for an original principal sum of $891,000 in March 1989. The FDIC lien further involves interest that has accrued since that date.

    As a practical matter the Taxing Units cannot sell this property which has a value of only some $333,000 with a potential FDIC lien of almost one million dollars. The practical effect of 12 U.S.C. § 1825(b)(2) is that at some point either one or both of the parties will find a purchaser who will discharge the tax lien and pay a sum to the FDIC which will represent a part of the FDIC's total lien, based upon the market value of the property in question and finding a willing buyer; the FDIC will foreclose on the subject property and either some other entity will buy it in and then have the responsibility of discharging the tax lien to the Taxing Units, or the FDIC will take it into inventory at which time the FDIC will have to discharge the tax lien as per its policy; or, the FDIC will eventually have to abandon its interest in the property in accordance with its policy. That is the practical effect of 12 U.S.C. § 1825(b)(2).

22

Congress was presented with the phenomenal task of addressing an impending catastrophe in the failure of financial institutions and in response enacted FIRREA. Certain provisions therein are the classic example of a "public program that adjusts the benefits and burdens of economic life to promote the common good." *Penn Cent., supra* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. As the Court has stated, "Legislation designed to promote the general welfare commonly burdens some more than others." *Id.* at 133, 98 S.Ct. at 2664, 57 L.Ed.2d at 654. This Court has found that delay in the exercise of a valuable property right alone is not sufficient to create a compensable taking. That finding is tempered, indeed limited, by the acknowledgement that *delay to this point* is not sufficient to constitute a compensable taking.

---

The Court would further note that the consensual lien on the subject property became the property of FDIC when it was appointed receiver in August 1990. The judgment below was entered on November 10, 1992, some two years and three months after this lien became an asset of the FDIC. FIRREA was adopted to allow the FDIC to take over failed financial institutions so that the ultimate loss to the taxpayers would be reduced. An inordinate delay on the part of the FDIC could not only result in defeating the reason for adopting FIRREA, but it could, if continued long enough, result in an unconstitutional taking. The Supreme Court discussed the limits that a governmental body can go to in diminishing property rights of another without their being an unconstitutional taking and said, "One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be ... compensation...." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 474, 107 S.Ct. at 1236, 94 L.Ed.2d at 481. Although two years and three months, under the facts of this case involving a piece of property worth in excess of $330,000, does not constitute a taking, it is approaching what this Court considers to be the maximum amount of time that should be allowed to resolve matters such as this without there being a "taking" requiring compensation.

23

Unmitigated delay, coupled with diminishment of distinct investment-backed expectations, *may, at some point,* infringe on the entire "bundle" of rights enjoyed by the Appellants to the point that a compensable taking occurs. With the forgoing admonition and as the record now stands, the Court rejects the Taxing Units' "Takings Clause" argument.

For the foregoing reasons, the judgment of the district court is AFFIRMED.