The **LAREDO ROAD CO.**, Plaintiff,

v.

**MAVERICK COUNTY, TEXAS**
Defendant.

No. CIV. DR–05–CA–18–AML.

United States District Court,
W.D. Texas,
Del Rio Division.

July 14, 2005.

Gerald E. Hopkins, Langtry, TX, for Plaintiff.

Portia Fleck Bosse, Allison, Bass & Associates L.L.P., Austin, TX, for Defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

LUDLUM, District Judge.

Pending before the Court in the above-styled and numbered cause is the Laredo Road Company's ("Plaintiff") application for a preliminary injunction. Based on the forthcoming reasons, the Plaintiff's application is **GRANTED**.

## I. BACKGROUND

On July 7, 2004, Plaintiff posted a sign, pursuant to § 243.0075 Tex. Loc. Gov't Code,[1] giving public notice that it intended to establish and operate a Sexually Oriented Business ("SOB"), doing business as "Babe's." According to the Plaintiff, construction on the location of the business commenced in August 2004.[2] On October 15, 2004, the Defendant adopted an Order to regulate SOBs within the unincorporated areas of Maverick County ("Defendant"), Texas.[3] The Defendant's Order also prohibited SOBs from operating "within a one (1) mile distance of a school, regular place of religious worship, residential neighborhood . . . ." § 100.006 Maver-

---

1. § 243.0075. Notice by Sign

   (a) An applicant for a license or permit issued under Section 243.007 for a location not previously licensed or permitted shall, not later than the 60th day before the date the application is filed, prominently post an outdoor sign at the location stating that a sexually oriented business is intended to be located on the premises and providing the name and business address of the applicant.

   (b) A person who intends to operate a sexually oriented business in the jurisdiction of a municipality or county that does not require the owner or operator of a sexually oriented business to obtain a license or permit shall, not later than the 60th day before the date the person intends to begin operation of the business, prominently post an outdoor sign at the location stating that a sexually oriented business is intended to be located on the premises and providing the name and business address of the owner and operator.

   (c) The sign must be at least 24 by 36 inches in size and must be written in lettering at least two inches in size. The municipality or county in which the sexually oriented business is to be located may require the sign to be both in English and a lan-

   guage other than English if it is likely that a substantial number of the residents in the area speak a language other than English as their familiar language.

2. The land that Plaintiff is using to operate its business is owned by Plaintiff's counsel, Mr. Gerald E. Hopkins. Plaintiff and Plaintiff's counsel have made the Court aware of this relationship from the onset of this case, and the Court has previously ruled on a Fed. R. Civ. P. 11 motion for sanctions filed by the Plaintiff in response to Defendant's motion to disqualify Plaintiff's counsel. (*See* Docket Entry # 38.)

3. § 100.001(a) of the Maverick County Regulations Regarding/Concerning Sexually Oriented Businesses states the purpose of the Order as:

   (a) Maverick County finds that the unrestricted operation of certain sexually oriented businesses may be detrimental to the public health, safety, and welfare by contributing to the decline of residential and business neighborhoods and to the potential growth of criminal activity. The purpose of this chapter is to provide Maverick County a means of remedying this problem.

ICK COUNTY REGULATIONS REGARDING/CONCERNING SEXUALLY ORIENTED BUSINESSES; *cf.* § 243.006(a)(2) TEX. LOC. GOV'T CODE. Subsequent to the adoption of the Order by the county, Plaintiff claims that it modified its business so that it would not operate as an SOB under the definitions contained in the Defendant's Order. The Plaintiff opened its business on February 23, 2005, after overcoming what it perceived to be "harassment" on the Defendant's part regarding issues such as electricity, water, and sewage connections for the premises.

On February 25, 2005, after what it perceived to be a threat from the Defendant to file criminal charges, the actual filing of criminal charges against an employee[4], and the possibility of applying for injunctive relief to stop the Plaintiff from operating its business, the Plaintiff filed for an emergency application for a Temporary Restraining Order ("TRO") and preliminary injunction. In its application, the Plaintiff claimed that the Defendant's Order, specifically § 100.002,[5] did not apply to its business and that even if it did, it was unconstitutional for numerous reasons.[6] On March 3, 2005, this Court denied Plaintiff's request for a TRO and scheduled a hearing to address the application for a preliminary injunction.[7]

Regarding the preliminary injunction, Plaintiff reiterates the primary argument it raised in the TRO application that Babe's does not fall under the definition of an SOB in the Defendant's Order, because its business is a "50–50" or "mixed" establishment, as known in the industry, whose primary business is the offering of all types of books, magazines, videos, DVD's, soft drinks, games, novelties, and live entertainment—including, but not limited to dancing, bands, singers, and a variety of other acts and performances. (*See* First Amended Complaint at 3 (Docket Entry # 3).) It further argues that any adult materials it sells are incidental to its primary business, and that the material and entertainment offered by the Plaintiff is protected by the First Amendment of the United States Constitution. In the alternative, Plaintiff argues that if it is found to

---

4. The charges against the employee were dropped after the justice of the peace court determined that it only had jurisdiction to hear Class C misdemeanors and not Class A misdemeanors, as required for any violation of an SOB regulation adopted pursuant to § 243.003. *See* § 243.010(b) TEX. LOC. GOV'T CODE.

5. § 100.002 of the MAVERICK COUNTY REGULATIONS REGARDING/CONCERNING SEXUALLY ORIENTED BUSINESSES adopts its definition of "sexually oriented businesses" primarily from § 243.002 of the TEX. LOC. GOV'T CODE and states:

   In this chapter, "sexually oriented business" means a sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, and/or any other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer.

6. According to the Plaintiff, those reasons include the Order being unconstitutional on its face, void for vagueness, and violative of the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Tex. Const. art. I, §§ 8 and 29. Because the Court determines this case on the federal issues, *infra*, Plaintiff's state constitutional claims are not addressed.

7. An informal in camera hearing was held with all parties present on March 17, 2005, where it was determined that a preliminary injunction hearing would be held sometime in the next couple of months depending on the Court's docket and the parties' schedules. The Court was finally able to schedule a preliminary injunction hearing for June 8, 2005, after the substitution of counsel for the Defendant and the filing of numerous motions and briefs on both sides.

be an SOB, the regulation, facially and as applied, is unconstitutional and Plaintiff seeks declaratory relief stating such. Other than the charges against Plaintiff's employee, which were eventually dropped, there has been no further action taken against the Plaintiff's business by the Defendant, and the Plaintiff has been operating its business without limitations.

At this time, the Court chooses to apply its equitable powers and rule only on the injunctive relief aspects of this case while reserving the opportunity to rule on the merits as the record further develops. This Court specifically admonished all parties that the preliminary injunction hearing was just that, a hearing on the preliminary injunction, and that the Court was not consolidating the hearing, pursuant to FED. R. CIV. P. 65(a)(2), with a trial on the merits.

## II. DISCUSSION

### A. Jurisdiction

■ The Court first looks to determine whether it has jurisdiction to hear this case. The Supreme Court has made it clear that "it is the duty of this court to see to it that the jurisdiction of the [district court], which is defined and limited by statute, is not exceeded." *City of Kenosha v. Bruno,* 412 U.S. 507, 511, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) (quoting *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908)). Plaintiff invoked this request for a preliminary injunction through 42 U.S.C. § 1983, and advised the Court that it had jurisdiction through 28 U.S.C. § 1343(a)(3) and (4), as well as federal question jurisdiction under 28 U.S.C. § 1331.

Section 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

"Section 1983 allows 'citizens' and 'other person[s]' within the jurisdiction' of the United States to seek legal and equitable relief from 'persons' who, under color of state law, deprive them of federally protected rights." *Va. Office for Prot. & Advocacy v. Reinhard,* 405 F.3d 185, 188–89 (4th Cir.2005) (emphasis in original). Plaintiff, a corporation, is a "person" as stated by § 1983 and defined by 1 U.S.C. § 1, which explains that "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." The Defendant, Maverick County, falls under the auspices of "person" as stated in § 1983 per the instruction of the Supreme Court in *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court is satisfied that it has jurisdiction under § 1983, and consequently § 1343(a)(3) & (4), which provide that federal courts have jurisdiction:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

Having established jurisdiction under § 1343 for equitable relief in this case, the Court need not address whether § 1331 jurisdiction is satisfied.

Finally, under 28 U.S.C. § 1367, the Court also has supplemental, or pendent, jurisdiction to determine whether the Plaintiff's business falls under the definitions of an SOB in the Defendant's Order and the Texas statute. *See also United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then ... there is *power* in federal courts to hear the whole.") (emphasis in original). Initially, this Court ruled that the state courts were competent to hear all of the Plaintiff's arguments in the pending criminal cases. Since those cases have been dismissed, the present action is the only available forum to determine the issues presented by the Plaintiff.

### B. Plaintiff's Business is an SOB

■ In its previous denial of the Plaintiff's application for a TRO, this Court ruled that based on the definitions in § 100.002 of the Defendant's regulation, as well as § 243.002 of the Tex. Loc. Gov't Code, the Plaintiff was indeed operating an SOB. (*See* Ct. Order Den. TRO March 3, 2005 (Docket Entry # 7.)) The Court's understanding was further solidified by the testimony of John N. Skruck III, stockholder, "general operator," and a person with twenty (20) years experience in running businesses such as the Plaintiff's. He testified about the Plaintiff's business in question during the preliminary injunction hearing. Even though Mr. Skruck had three (3) months between this Court's denial of Plaintiff's TRO application and the preliminary injunction hearing, he could give the Court no specific details regarding the Plaintiff's inventory.[8] He did state, however, that the Plaintiff had a two-to-one ratio of adult to non-adult videos in inventory and a three-to-one ratio of adult-fare magazines to non-adult fare magazines in inventory. He also stated that Plaintiff's business would provide, among other things, premises for the private viewing of adult videos, the availability of sex toys and novelties for purchase, and the ability to view topless and nude female dancers on certain days and at certain times.[9]

The Defendant's Order defines SOBs as "sex parlors, nude studios, modeling studios, love parlors, adult bookstores, adult movie theaters, adult video arcades, adult movie arcades, adult video stores, adult motels, and/or any other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." § 100.002 MAVERICK COUNTY REGULATIONS REGARDING/CONCERNING SEXUALLY ORIENTED BUSINESSES. The Plaintiff argues that it is a "50–50" business that does not engage in, as its "primary business," the offering of any of the above mentioned activities or items. It further argues that its statutory interpretation of the Defendant's Order, as well as the Texas statute, leads it to be-

---

**8.** Mr. Skruck stated that he could not be specific about the inventory because he did not order the inventory for Plaintiff's business, even though he was the "general operator" of the business.

**9.** Mr. Skruck testified that there was nude dancing on Tuesdays and Wednesdays from 6:00 PM to 2:00 AM and on Thursdays, Fridays, and Saturdays from 6:00 PM to 4:00 AM for a total of about forty-six (46) hours per week.

lieve that an entity has to provide to consumers—as its "primary business"—one of the examples of what the Order classifies as an SOB.

The Court previously found that the statutes (county regulation and Texas local government code) list venues that sell adult videos, adult video arcades, adult magazines, and nude studios categorically as SOBs. The Court further found that commercial enterprises whose "primary business" is the offering of a service or the selling, renting, or exhibiting of items intended to provide sexual stimulation or sexual gratification to a customer as another category of SOBs. The Court is supported in its interpretation of the Order and the Texas statute by the Supreme Court's *last antecedent rule*. "Under the last antecedent rule, 'a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows ....' " *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 125 S.Ct. 694, 708, 160 L.Ed.2d 708, 724 (2005) (Souter, J., dissenting) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)). Under this Supreme Court doctrine, the specific or limiting phrase of "the primary business of which is the offering" in the Defendant's Order immediately follows the noun "commercial enterprise," and thus seeks only to modify "commercial enterprise" and not the previously mentioned adult bookstores, video stores, movie theaters, etc.

Furthermore, similar to the Texas statute, the Defendant's Order provides a listing of businesses that are exempt from regulation as an SOB—including "a bookstore, movie theater, or video store, unless that business is an adult bookstore, adult movie theater, or adult video store under Section 100.002." § 100.004(1) MAVERICK COUNTY REGULATIONS REGARDING/CONCERNING SEXUALLY ORIENTED BUSINESSES; *cf.* § 243.004(1) TEX. LOC. GOV'T CODE. Both statutes exclude the phrase "the primary business of which" in the listing of adult business that are not exempt from SOB regulation. This further bolsters this Court's finding that Plaintiff's business is of the type defined by the statutes as an SOB, regardless of whether it believes its business is a "50–50" or "mixed" establishment whose "primary business" is the offering of all types of books, magazines, videos, DVD's, soft drinks, games, novelties, and live entertainment. Nothing proffered at the preliminary injunction hearing has changed the Court's opinion that the Plaintiff is operating an SOB. In fact, the hearing only strengthened the Court's understanding of what an SOB is under the statutes, and that the Plaintiff's business falls under that definition.[10]

### C. Level of Scrutiny to Apply to Defendant's Order

■ The Court must determine what level of scrutiny to apply in reviewing the constitutionality of the Defendant's Order. The Defendant's Order does not set out to ban businesses such as the Plaintiff's but merely states that a license is required to operate Plaintiff's business, and that Plaintiff's business may not be located within one (1) mile of schools, regular places of worship, and residential neighborhoods. The Supreme Court has stated that "ordinances designed to combat the undesirable secondary effects of such [sexually oriented] businesses are to be reviewed under

---

10. After being told by Plaintiff's counsel on numerous occasions that he had in all of his years of practice never heard of another court that analyzed the statutes the way this Court had, the Court was "relieved" to discover an unpublished Texas case, litigated by Plaintiff's counsel, that viewed the statute and its definition of an SOB analogously to the Court. *See Meijas v. State*, 2002 WL 112534, 2002 Tex. App. LEXIS 591 (Tex.App.—San Antonio Jan. 30, 2002).

the standards applicable to 'content-neutral' time, place, and manner regulations." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *see also Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291 (5th Cir.2003) ("Zoning regulations restricting the location of adult entertainment businesses are considered time, place, and manner regulations, however, if they do not ban such businesses throughout the whole of a jurisdiction and are 'designed to combat the undesirable secondary effects of such businesses' rather than to restrict the content of their speech *per se.*"). Therefore, in the instant case, and similar to the ordinance in *Renton*, "[t]he [order] is ... properly analyzed as a form of time, place, and manner regulation." *Id.* at 46, 106 S.Ct. 925. The Plaintiff also concedes that the controversy at hand involves a "content-neutral" time, place, and manner restriction and not a "content-based" restriction of constitutionally protected free speech. (*See* Pl.'s Mem. of Law in Support of Prelim. Inj. at 33) ("This Order is a time, place, and manner regulation subject to intermediate scrutiny under *Renton*.").

■ A court must apply intermediate scrutiny in analyzing the constitutionality of such a statute by determining whether the "content-neutral" time, place, and manner regulation is designed to meet a substantial governmental interest and does not unreasonably limit alternative vehicles of communication. *See Renton*, 475 U.S. at 47, 106 S.Ct. 925. The Order: (1) must

not reach to the content of the regulated speech; (2) must be narrowly tailored to serve a significant governmental interest; and (3) must preserve, without unreasonably limiting, alternative channels of communication. *See Woodall v. City of El Paso*, 49 F.3d 1120, 1122 (5th Cir.1995) (citing *Renton*, 475 U.S. at 46–48, 106 S.Ct. 925).[11]

### D. Plaintiff's Challenges to Defendant's Order

Plaintiff lists the following as the constitutional defects in the Defendant's Order that it challenges: (1) the Order fails to define the businesses it seeks to regulate; (2) the Order lacks an amortization provision; (3) the Order lacks any provisions for obtaining a license; (4) the Order contains no provision for appeal from denial, suspension, or revocation of a license; (5) the Order does not rely on studies or findings regarding the secondary effects of an unregulated SOB; (6) the Order lacks support for the one (1) mile restriction and fails to provide for the availability of alternate sites; and (7) the Defendant's Order is unconstitutional as applied because Plaintiff's "primary business" is not adult related.

### 1. Failure of Order to Define Business it Seeks to Regulate

The Court has already addressed Plaintiff's claim that the Defendant's Order is void for vagueness on its face when it found that the Plaintiff was covered by the definition of an SOB that the Order sought

11. If this case involved the regulation of free speech in the form of expressive conduct, then the Court would be governed by the four-part test the Supreme Court laid out in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) ("[A] government regulation is sufficiently justified if it is (1) within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.") (quoting *O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673).

to regulate. The Fifth Circuit has instructed that "[a]ny statute or ordinance which proscribes certain conduct must be sufficiently definite to 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' and to avoid the possibility of arbitrary and erratic arrests and convictions." *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir.1980) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)).

Plaintiff admitted that its original intent was to be an SOB, and that it sought to modify itself when it caught wind that the Defendant was adopting an Order to regulate SOBs within the unincorporated areas of the county. The Court is not in agreement with Plaintiff's reading of the Defendant's Order or the Texas local government code's definition of what an SOB is, as already noted. Plaintiff's business of selling adult videos and magazines is enough to categorize it as an SOB under the Defendant's Order and the Texas statute.[12] Therefore, this portion of the Defendant's Order is not void for vagueness.

### 2. Lack of Amortization Provision in the Order

■ Plaintiff argues that the Defendant's Order is unconstitutional because it provides no provision for amortization to prevent a Fifth Amendment "taking" without compensation, thus not allowing businesses that were in existence at the time the Order was adopted to recoup or recover their investments.[13] (*See* Pl.'s Mem. of Law in Support of Prelim. Inj. at 13.) Plaintiff further argues that at the time Defendant's Order was enacted, construction was eighty (80%) percent completed and that "Babe's is entitled to amortization for at least 80% of its construction cost if it is determined that Babe's was a sexually oriented business at the time the Order was enacted ...." (*Id.* at 19.) Plaintiff's claim that the Defendant's Order is the equivalent of a "taking" under the Fifth Amendment is made applicable to the instant case through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 240, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. ——, ——, 125 S.Ct. 2074, 2081, 161 L.Ed.2d 876, 887 (2005) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). "[G]overnment regulation of private property may, in some instances, be so onerous

**12.** The Plaintiff may have a more convincing argument if it were only selling sexual toys and novelties and providing nude dancing under the provision of the Defendant's Order and the Texas statute that addresses "commercial enterprise(s) the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." Under the Court's categorical approach, the analysis would turn on whether the offering of the service of nude dancing, or the percentage of profits derived from the selling, renting or exhibiting of sexual toys and novelties, constitutes the "primary business" of the Plaintiff's commercial enterprise. That argument, however, would have to stand up to the Fifth Circuit's statement that "[a] provision need not, however, be cast in terms that are mathematically precise; it need only give fair warning of the conduct proscribed, in light of common understanding and practices." *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir.1980)

**13.** Plaintiff only has standing to argue its own claim that as an SOB that was in existence before the Defendant's Order was enacted, it should be allowed to recoup or recover its investments.

that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.,* 544 U.S. at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at 887. Therefore, there are different categories of "takings" recognized by the Supreme Court:

> Our precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of *"all* economically beneficial use" of her property. *Lucas,* 505 U.S., at 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (emphasis in original). We held in *Lucas* that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property. *505 U.S.* at 1026–1032, 112 S.Ct. 2886, 120 L.Ed.2d 798.

Outside these two relatively narrow categories (and the special context of land-use exactions discussed below, see *infra,* at 739 – 741), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The Court in *Penn Central* acknowledged that it had hitherto been "unable to develop any 'set formula' " for evaluating regulatory takings claims, but identified "several factors that have particular signifi-

cance." *Id.,* 438 U.S. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631. Primary among those factors are "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Ibid.* In addition, the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"—may be relevant in discerning whether a taking has occurred. *Ibid.* The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules. *See, e.g., Palazzolo v. Rhode Island,* 533 U.S. 606, 617–618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); 533 U.S. at 632–634, 121 S.Ct. 2448, 150 L.Ed.2d 592 (O' Connor, J., concurring).

*Id.,* 544 U.S. at ——, 125 S.Ct. at 2081–82, 161 L.Ed.2d at 887–88.

The Defendant, in its responses to the Plaintiff's motions, points out to this Court that under *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), a regulation must "substantially advance" a legitimate governmental interest to not be considered a taking under the Fifth Amendment, and that the Defendant's Order does indeed "substantially advance" a legitimate governmental interest. In *Lingle,* the Supreme Court overruled its holding in *Agins* and stated that:

> [w]e hold that the "substantially advances" formula is not a valid takings test, and indeed conclude that it has no proper place in our takings jurisprudence. In so doing, we reaffirm that a plaintiff seeking to challenge a govern-

ment regulation as an uncompensated taking of private property may proceed under one of the other theories discussed above—by alleging a "physical" taking, a *Lucas*-type "total regulatory taking," [or] a *Penn Central* taking . . . . *Lingle,* 544 U.S. at ——, 125 S.Ct. at 2087, 161 L.Ed.2d at 894. In the instant case, we have neither a "physical" taking of property nor a *Lucas*-type regulation that completely deprives the owner of all economically beneficial use of the property. This Court will therefore engage in a *Penn Central* Fifth amendment "takings" analysis of the Plaintiff's claim.

■ "States and cities may enact land-use restrictions or controls *to enhance the quality of life* by preserving the character and desirable aesthetic features of a city . . . ." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (emphasis added). As stated *supra,* a court must consider the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations." *Id.* at 124, 98 S.Ct. 2646 (citing *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962)). Additionally, a court must determine the character of the government action, especially since a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government [rather] than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* (citing *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)). The Fifth Circuit has explained that "[i]n order for regulatory action to rise to the level of an unconstitutional taking, there must be a complete deprivation of the owner's economically viable use of his property." *Matagorda County v. Rus-*

*sell Law,* 19 F.3d 215, 223 (5th Cir.1994) (citing *Penn Cent.,* 438 U.S. at 138 n. 36, 98 S.Ct. 2646; *Agins,* 447 U.S. at 260, 100 S.Ct. 2138; *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 813 (1992)). "Where virtually all of the owner's possessory rights are left intact, the interference cannot be a taking." *Id.* (citing *Penn Cent.,* 438 U.S. at 130–31, 98 S.Ct. 2646).

The Court does not find Plaintiff's inability to operate as an SOB within one (1) mile of schools, places of worship, or residential areas to be a "taking" under the Fifth Amendment. Although the Plaintiff's claims are what are at issue here, it appears that a great deal of the amortization and Fifth Amendment "takings" arguments are driven by Plaintiff counsel's personal interests in the Plaintiff operating its business on his land. (*See* Pl.'s Resp. To Def.'s Mot. To Disqualify Pl.'s Counsel (Docket Entry # 25.)) While Plaintiff counsel's land maybe within one (1) mile of a school, place of religious worship, or residential area, there are, according to the Defendant, plenty of other areas for the Plaintiff to set up its business. Furthermore, if the Court were to engage in a "takings" analysis regarding any personal claim that counsel may have raised concerning his land, it would in all likelihood determine that there was no Fifth Amendment "taking" under the Supreme Court's instruction in *Penn Cent.* and the Fifth Circuit's holding in *Matagorda.*

It is true that Defendant's Order will have an economic impact on the Plaintiff's business if the Plaintiff is unable to qualify for a license to operate a business that this Court has found to be an SOB. The Court cannot take into account any distinct investment-backed expectations the Plaintiff may have had when it decided to establish its business because the Plaintiff did not establish those expectations at the prelimi-

nary injunction hearing. However, "damage or loss does not of itself create a taking. Whether property has been taken for a public use so as to require just compensation is determined by the character of the invasion, not by the amount of damage suffered." *Southpark Square, Ltd. v. City of Jackson,* 565 F.2d 338, 344 (5th Cir.1977) (quoting *Woodland Market Realty Co. v. City of Cleveland,* 426 F.2d 955, 958 (6th Cir.1970)).

The character of the Defendant's action was to utilize its police powers to "enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city ...." *Penn Cent.,* 438 U.S. at 129, 98 S.Ct. 2646. The Plaintiff only argues that construction on the business was eighty (80%) percent complete when the Defendant's Order was adopted. Plaintiff had four (4) months' notice from when the Defendant adopted its Order on October 15, 2004, to when Plaintiff opened its business on February 23, 2005. The Plaintiff opted to continue with construction under the impression, with advice from its counsel according to Mr. Skruck, that it would not qualify as an SOB but as a "50–50" establishment. That Plaintiff's counsel chose to give advice to the Plaintiff based on what it terms an "industry practice" as opposed to statutory law or binding judicial doctrine is between the Plaintiff and its counsel.[14]

14. The Court will not inquire into the status or workings of Plaintiff and its relationship with its counsel; however, the Court finds it interesting that some of the same individuals, or individuals related to those involved with the Plaintiff, have argued similar issues in different locations and courts. *See, e.g., LLEH, Inc. v. Wichita County,* 289 F.3d 358 (5th Cir.2002) (involving same counsel for plaintiff in the case, as well as the similar name of Babe's for plaintiff's business).

The Defendant's Order adjusted the benefits and burdens of economic life for the Plaintiff to promote the common good of the community by adopting a regulation whose goal was to combat the secondary effects of SOBs. Whatever damages or losses that the Plaintiff would hypothetically suffer under the Defendant's Order do not rise to the level constituting a "taking," especially when the Plaintiff had four (4) months' notice before it opened that it would need to obtain a license to operate as an SOB.[15] Therefore, the Court finds that the Defendant's Order is not unconstitutional for failing to contain an amortization provision. There was no "taking," for purposes of the Fifth Amendment, which would require amortization to justify the Plaintiff's claim. Additionally, under the Plaintiff's own assertions, it has proven that it can operate a business free of adult materials at its present location. If the Plaintiff is to be believed, Babe's is currently operating profitably with most its inventory marketed as non-adult fare.

### 3. Unconstitutional Licensing Scheme

■ The Plaintiff argues that the Defendant's Order is a prior restraint that fails to provide adequate procedural safeguards, and that the Order lacks any provisions for licensing and is unconstitutional on its face. (*See* Pl.'s Mem. of Law in Support of Prelim. Inj. at 21–22.) While the Court has determined that the Defendant's Order is to be reviewed under the

15. Plaintiff cannot argue that its original intent was to be an SOB, then argue that it modified itself to not be an SOB, and then argue that if it is an SOB then the Defendant's Order is a "taking" under the Fifth Amendment and there should be an amortization provision in the Order. Plaintiff understood that there was the potential for its business to still be qualified as an SOB after the modifications, and this Court refuses to reward the Plaintiff, under the pretext of a constitutional "taking," for the consequences of its own self-inflicted risk.

intermediate scrutiny of a content-neutral time, place, and manner regulation, "[e]ven a content-neutral regulation may be considered a prior restraint if it gives government officials 'unbridled discretion' to restrict protected speech." *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291 (5th Cir.2003) (citing *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). Additionally, "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citing *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Vance v. Universal Amusement Co.*, 445 U.S. 308, 316, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980)). "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id.* at 227, 110 S.Ct. 596.

█ Section 100.007(b) of the Defendant's Order provides that "Maverick County regulations adopted under this chapter shall provide for the denial, suspension, or revocation of a license or other permit by Maverick County." Nowhere else within its Order does the Defendant provide for any method or time frame for the Defendant to render a decision on an application for a license or permit to operate an SOB. Other than the fact that the applications for a license or other permit shall be maintained and/or controlled by the Maverick County Inspector's Office, no evidence was ever presented by the Defendant that additional regulations were ever adopted to supplement the provisions of § 100.007(b). Thus, this portion of the Defendant's Order is facially defective as an unconstitutional prior restraint that provides officials with "unbridled discretion" to restrict free speech and fails to place any limit on the time frame within which a decision must be made regarding the Plaintiff's, or any other applicant's petition for a license.

### 4. No Provision For Appeal

Plaintiff argues that the Defendant's Order does not provide for expeditious judicial review, and that the "[c]ounty's Order contains no provision for appeal from the denial, suspension, or revocation of a license and is, therefore, facially unconstitutional under the due process clause." (Pl.'s Mem. of Law in Support of Prelim. Inj. at 23.) Plaintiff bases its argument on the Supreme Court's decisions in *Freedman* and *FW/PBS*. Plaintiff is incorrect in stating that the Defendant's Order does not provide any avenue for appeal as § 100.007(c) of the Order states that "[a] district court has jurisdiction of a suit that arises from the denial, suspension, or revocation of a license or other permit by Maverick County."

The Supreme Court, in *City of Littleton v. Z.J. Gifts D–4, L.L.C.*, 541 U.S. 774, 781, 124 S.Ct. 2219, 159 L.Ed.2d 84 (2004), modified its ruling in *FW/PBS*, withdrawing the implication that its decision in *Freedman* applies to adult entertainment or SOB controversies and special judicial review. In *City of Littleton*, the owner of an adult bookstore sued the City of Littleton, alleging that the city's ordinance requiring a license for adult businesses was facially unconstitutional since it did not provide for "prompt judicial review." The Supreme Court found that "Colorado's ordinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly. And whether the courts do so is a matter nor-

742

mally fit for case-by-case determination rather than a facial challenge." *Id.* at 781–82, 124 S.Ct. 2219. The Court held that "[w]here (as here and as in *FW/PBS*) the regulation simply conditions the operation of an adult business on compliance with neutral and nondiscretionary criteria, and does not seek to censor content, an adult business is not entitled to an unusually speedy judicial decision of the *Freedman* type." *Id.* at 784, 124 S.Ct. 2219 (citations omitted).

This Court places the same confidence in the ordinary Texas judicial review procedures that the Supreme Court placed in the Colorado judicial review procedures for the denial of a license or permit to operate an SOB. The Defendant's Order, which this Court has found to be content-neutral, provides for judicial review of a denial, suspension, or revocation of a license or permit to operate an SOB. There is not any reason to believe that the Texas judiciary will not suffice to remain sensitive to the need to prevent First Amendment harms and administer its judicial review procedures accordingly. Thus, the Court finds that this portion of the Defendant's Order is sufficient to survive a facial challenge, as it provides a provision for appeal that allows a party to have access to the Texas judicial review procedures where a court may prevent any First Amendment harm. *See id.*

5. *No Studies and No Specific Findings as to Secondary Effects of SOBs*

■ Plaintiff argues that the Defendant conducted no studies of its own, nor did it consider or rely upon studies from other cities or counties as to the secondary effects of SOBs, and that the Order has no basis in fact and is unconstitutional on its face. The Defendant counters that it is exercising its "police powers" in addressing the public interest of its community by adopting the Order. *See Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed.

27 (1954) ("Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs."). Additionally, the Plaintiff levels an accusation against the Defendant that "the predominant motive in passing the Order was not to combat secondary effects, but to put Babe's [Plaintiff's business] out of business to protect the Kickapoo Tribe and the Lucky Eagle Casino ...." (Pl.'s Mem. of Law in Support of Prelim. Inj. at 25.) However, the Supreme Court has warned that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

It was established during the preliminary injunction hearing that the Defendant researched other cities' studies as to the secondary effects of SOBs, including the City of Eagle Pass, Texas, which is within the Defendant's boundaries and has an ordinance regulating SOBs. The secondary effects of unregulated SOBs can "include crime, reduction of economic activity, and lowered property values." *Encore Videos, Inc. v. City of San Antonio,* 330 F.3d 288, 291 (5th Cir.2003) (citing *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.,* 973 F.2d 1255, 1257 (5th Cir.1992)). The Defendant also relied upon the Tex. Loc. Gov't Code which states:

The legislature finds that the unrestricted operation of certain sexually oriented businesses may be detrimental to the public health, safety, and welfare by contributing to the decline of residential and business neighborhoods and the growth of criminal activity. The purpose of this chapter is to provide local

governments a means of remedying this problem.

§ 243.001 Tex. Loc. Gov't Code.[16]

Plaintiff's argument is foreclosed by the Supreme Court's holding that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In fact, a municipality or county is "entitled to rely on the experiences of . . . other cities . . . in enacting its adult [entertainment] zoning ordinance." *Id.* at 51, 106 S.Ct. 925. The Defendant's reliance on other studies, including the municipality of Eagle Pass, Texas, is strengthened by the Fifth Circuit's finding that "[t]he secondary effects [of SOBs] that urban areas have experienced . . . are precisely what [a][c]ounty is attempting to *avoid.*" *LLEH, Inc. v. Wichita County*, 289 F.3d 358, 367 (5th Cir.2002) (emphasis added).

The Court finds that the Defendant's interest in battling the secondary effects of unregulated SOBs, through the exercise of its police powers, is properly set forth in its reliance on the studies of other cities and the "purpose and effects" provision of § 243.001 of the Tex. Loc. Gov't Code. The First Amendment does not require that a legislative body wait until it is in the throes of an epidemic to conduct studies on the secondary effects of unregulated SOBs

before it passes a regulation or ordinance to address the issue. The Defendant's Order survives this aspect of the Plaintiff's constitutional challenge. If the Defendant can learn from the experiences of other municipalities and counties when issuing a content-neutral regulation, without having to directly or indirectly experience the downside or secondary effects of SOBs, then so be it.

### 6. One (1) Mile Restriction

■ The Plaintiff argues that the Defendant's Order fails under the third prong of *Renton* because, by requiring that an SOB not be allowed to operate within a one (1) mile distance of a school, place of religious worship, or residential neighborhood, the Order unreasonably limits any alternative vehicles of communication by not providing any alternative sites for a pre-existing SOB to relocate. (*See* Pl.'s Mem. of Law in Support of Prelim. Inj. at 26); *see also Woodall v. City of El Paso*, 49 F.3d 1120, 1122 (5th Cir.1995) (citing *Renton*, 475 U.S. at 46–48, 106 S.Ct. 925). In support of its contention, the Plaintiff states that:

> [i]t should be pointed out that a one mile distance restriction is actually a two mile radius, substantially reducing the possibility that alternative sites exist. Additionally, because Maverick County is largely rural, most if not all sites are not accessible to the public, are unsuitable for any commercial business, and lack proper infrastructure such as roads and utilities.

---

**16.** Maverick County Regulations Regarding/Concerning Sexually Oriented Businesses' preamble is almost verbatim to the Texas state statute:

§ 100.001 Purpose: Effect on Other Regulatory Authority

(a) Maverick County finds that the unrestricted operation of certain sexually oriented businesses may be detrimental to

the public health, safety, and welfare by contributing to the decline of residential and business neighborhoods and to the potential growth of criminal activity. The purpose of this chapter is to provide Maverick County a means of remedying this problem.

.    .    .    .    .

(Pl.'s Mem. of Law in Support of Prelim. Inj. at 28.) The Defendant counters that the Plaintiff's business is currently located approximately seven-tenths (7/10ths) of a mile from an elementary school, three-tenths (3/10ths) of a mile from a church, and is surrounded by, and next to, several family residences. (*See* Def.'s Answer to Pl.'s Second Am. Compl. at 6 (Docket Entry # 24.)) During the hearing, the Defendant, through the county judge, explained that there were other areas for the Plaintiff to establish its business that would not be near the areas proscribed in the Defendant's Order. Specifically, the county judge testified that the unincorporated areas in Maverick County included 35 miles of land north of the City of Eagle Pass, 20 or 30 miles of land south of Eagle Pass, and 30 miles of land east of Eagle Pass that were available for the Plaintiff to establish its business and not be within one (1) mile of a school, place of religious worship, or residential area. The Court takes judicial notice that west of Eagle Pass and Maverick County lies the Rio Grande River and the Republic of Mexico. Obviously those areas are not available to the Plaintiff.

In *Renton,* the Supreme Court stated:

That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation.... we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.... In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement.

*Renton,* 475 U.S. at 54, 106 S.Ct. 925. The Fifth Circuit, in an opinion in which it denied a petition for rehearing and suggestion for rehearing en banc, interpreted *Renton* to say:

When Renton stated that the theater owners "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees," the Court obviously contemplated that there was a "market" in which businesses could purchase or lease real property on which business could be conducted. A real estate market that provides no opportunity to compete cannot provide a reasonable opportunity to do so. Cities that allocate only land that is completely unsuitable from a legal or physical standpoint for adult business use do exactly what the court proscribed in Renton: effectively suppress protected speech.

*Woodall v. City of El Paso,* 959 F.2d 1305, 1306, *reh'g denied, suggestion for en banc denied,* (5th Cir.1992) (per curiam) (citations omitted) (*Woodall II*). The Plaintiff cites to *Woodall* to support its argument that the alternative vehicles of communication that are "available," i.e. other land areas, should not be considered "available" because those areas' physical characteristics render them "unavailable" for constitutional purposes under *Renton. See Woodall,* 49 F.3d at 1124 (citing *Woodall v. City of El Paso,* 959 F.2d 1305 (5th Cir. 1992) (per curiam) (*Woodall II*)). The Fifth Circuit provided its understanding of what constitutes "physical availability" as:

Physical availability may be thought of in terms of the cost of altering or developing the area to change its physical characteristics to make it suitable for some generic commercial enterprise. The relevant consideration is whether the physical characteristics of the site present an unreasonable obstacle to

opening a business; an obstacle that can be overcome without incurring unreasonable expense does not make a site unavailable, but an obstacle that cannot reasonably be overcome renders the site unavailable. Thus, in determining whether there are sufficient sites available, the finder of fact may exclude land under the ocean, airstrips of international airports, sports stadiums, areas not readily accessible to the public, areas developed in a manner unsuitable for any generic commercial business, areas lacking in proper infrastructure, and so on.

*Id.* (citing *Topanga Press Inc., v. City of Los Angeles,* 989 F.2d 1524, 1532 (9th Cir. 1993)). The Fifth Circuit clarified its reasoning to explain that when it came to the commercial potential of a site:

the fact that a site may not be commercially desirable does not render it unavailable. It is not relevant that a relocation site will result in lost profits, higher overhead costs, or even prove commercially unfeasible for an adult business.... As we have stated time and again, commercial viability is not a relevant consideration.

*Id.* (citations omitted).

This Court distinguishes the Fifth Circuit's reading of *Renton,* through its declaration in *Woodall* and *Woodall II,* from the instant case because of the characteristics of the venues involved.[17] In 2003, it was estimated that Maverick County had a population of 50,178; in 2002, it had 15,455 housing units; and in 2000, it had a land area of 1280 square miles with an average of 36.9 persons per square mile.[18] In con-

17. Neither party has provided the Court with any specific information to help the Court determine whether the Defendant's Order is in compliance with the Fifth Circuit's reading of *Renton.*

18. United States Census Bureau information for Maverick County, Texas, *available at http://quickfacts.census. gov/qfd/states/48/ 48323.html* (last revised Feb. 1, 2005) (last visited June 22, 2005).

| People QuickFacts | Maverick County | Texas |
| --- | --- | --- |
| Population, 2003 estimate | 50,178 | 22,118,509 |
| Population, percent change, April 1, 2000 to July 1, 2003 | 6.1% | 6.1% |
| Population, 2000 | 47,297 | 20,851,820 |
| Population, percent change, 1990 to 2000 | 30.0% | 22.8% |
| | | |
| Housing units, 2002 | 15,455 | 8,502,060 |
| Homeownership rate, 2000 | 69.6% | 63.8% |
| Housing units in multi-unit structures, percent, 2000 | 14.0% | 24.2% |
| Median value of owner-occupied housing units, 2000 | $50,200 | $82,500 |
| | | |
| Geography QuickFacts | Maverick County | Texas |
| Land area, 2000 (square miles) | 1,280 | 261,797 |
| Persons per square mile, 2000 | 36.9 | 79.6 |
| Metropolitan Area | None | |
| FIPS Code | 323 | 48 |

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.
FN: Footnote on this item for this area in place of data
NA: Not available
D: Suppressed to avoid disclosure of confidential information
X: Not applicable
S: Suppressed; does not meet publication standards

trast, in 2000, the City of El Paso had a population of 563,662; 193,663 housing units; and a land area of 249 square miles with an average of 2,263.0 persons per square mile.[19] The Plaintiff, in essence, asks this Court to hold the Defendant hostage by applying the Fifth Circuit's understanding of *Renton*, as applied to the City of El Paso, to a rural county such as Maverick. By way of comparison, the City of El Paso has 2226.1 more persons per square mile than Maverick County. Maverick County, on the other hand, has 1031 square miles more land than the City of El Paso. Common sense would tell us that in a physically smaller but much more populated area, especially in a first world country such as the United States, the infra-structure would have to be significantly more developed to accommodate the population than it would have to be for a physically larger but more rural and less-populated area. Suffice it to say that the City of El Paso has more "physically available" areas of development and infrastructure—as well as the ability to zone SOBs to those specific areas—that would be suitable, from a physical and legal standpoint, to provide alternative vehicles of communication than does Maverick County.

Surely the Fifth Circuit does not read the Supreme Court's holding in *Renton* to require this Court to hold the Defendant, in the instant case, to the same standards as a much more densely populated and developed municipality such as the City of

Z: Value greater than zero but less than half unit of measure shown
F: Fewer than 100 firms
Source: US Census Bureau State & County QuickFacts

19. United States Census Bureau information for City of El Paso, Texas, *available at http://quickfacts.census. gov/qfd/states/48/ 4824000.html* (last revised Feb. 1, 2005) (last visited June 22, 2005).

| People QuickFacts | El Paso | Texas |
| --- | --- | --- |
| Population, 2000 | 563,662 | 20,851,820 |
| Population, percent change, 1990 to 2000 | 9.3% | 22.8% |
| Housing units, 2000 | 193,663 | 8,157,575 |
| Homeownership rate, 2000 | 61.4% | 63.8% |
| Median value of owner-occupied housing units, 2000 | $71,300 | $82,500 |
| Geography QuickFacts | El Paso | Texas |
| Land area, 2000 (square miles) | 249 | 261,797 |
| Persons per square mile, 2000 | 2,263.0 | 79.6 |
| FIPS Code | 24000 | 48 |

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.
FN: Footnote on this item for this area in place of data
NA: Not available
D: Suppressed to avoid disclosure of confidential information
X: Not applicable
S: Suppressed; does not meet publication standards
Z: Value greater than zero but less than half unit of measure shown
F: Fewer than 100 firms
Source: US Census Bureau State & County QuickFacts

El Paso. The county judge testified that there was land available, surrounding the City of Eagle Pass, for the Defendant to operate its SOB that would not be within one (1) mile of the proscribed locations. The fact that the Defendant, according to the Plaintiff, may have less "physically available" locations to provide alternative vehicles of communication than would a municipality with a more developed infrastructure and the ability to provide those "physically available" areas cannot be held against the Defendant. The Defendant must provide "alternative" vehicles of communication and not "custom-made to the Plaintiff's specifications" vehicles of communication. Furthermore, as discussed *supra*, there is the issue of the Plaintiff's counsel owning the land that the Plaintiff's business is located on, making this Court view the Plaintiff's reluctance to relocate to another area within the county, which may be "physically available," with a degree of skepticism.

The Court finds that the one (1) mile distance requirement in the Defendant's Order does not unreasonably limit any alternative vehicles of communication as prescribed by *Renton*. Due to the characteristics of the Defendant as a mostly rural county, the Court finds that the Fifth Circuit's interpretation of *Renton*, as stated in *Woodall*, 49 F.3d at 1122–24 and *Woodall*, 959 F.2d at 1305–06 (*Woodall II*), does not apply to the Defendant or the Defendant's Order.

### 7. Order Unconstitutional as Applied because Plaintiff's "Primary Business" is not Adult Related

Plaintiff's argument that the Defendant's Order is unconstitutional as applied because its "primary business" is not adult related is foreclosed by this Court's finding that Plaintiff is indeed operating an SOB. *See supra* Part II, Section B.

### E. Summary of the Court's Constitutional Analysis

As discussed *supra*, the Defendant's Order is a content-neutral time, place, and manner regulation. To withstand a constitutional challenge by the Plaintiff, the Order must survive intermediate scrutiny by: (1) not reaching to the content of the regulated speech; (2) being narrowly tailored to serve a significant governmental interest; and (3) preserve, without unreasonably limiting, alternative channels of communication. *See Woodall*, 49 F.3d at 1122 (citing *City of Renton*, 475 U.S. at 46–48, 106 S.Ct. 925).

The Court has already established that the Defendant's Order does not reach to the content of the regulated speech that the Plaintiff is engaged in, nor does the Order unreasonably limit or fail to preserve alternative channels of communication. However, the Court has also determined that § 100.007(b) of the Defendant's Order is not narrowly tailored to serve a significant governmental interest. *See supra* Section II, Part D, Number 3. It provides officials with "unbridled discretion" to restrict free speech and fails to place any limit on the time frame within which a decision must be made regarding an application. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *see also Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291 (5th Cir.2003) (citing *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). As a result, the Court finds that the Defendant's Order does not survive an intermediate-level review of its constitutionality, because it is not narrowly tailored to serve the significant governmental interest of regulating SOBs in order to effectively combat their secondary effects.

### III. PRELIMINARY INJUNCTION

■ Having established that Plaintiff's business is an SOB and that the Defendant's Order is unconstitutional, the Court now must determine whether a preliminary injunction should be granted restricting the Defendant from enforcing its Order. TROs and preliminary injunctions fall under the auspices of FED. R. CIV. P. 65. For the Court to grant the Plaintiff's application for a preliminary injunction, the Plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damages that the injunction may cause defendants; and (4) that the injunction will not disserve the public interest. *See Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir.1999). "Injunctive relief is an extraordinary and drastic remedies, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985).

The Plaintiff has established a substantial likelihood of success on the merits, and the Defendant is enjoined from enforcing its Order against the Plaintiff's business. The Plaintiff has shown that the Defendant's Order is unconstitutional on its face as a prior restraint that allows the Defendant "unbridled discretion" over the Plaintiff's First Amendment rights. The Plaintiff has also established that it will suffer irreparable injury because its rights to free speech, as protected by the First Amendment, will be curtailed if the Defendant is allowed to enforce its Order.[20] The fact that the Defendant is not currently enforcing its Order against the Plaintiff supports the proposition that the threat of injury to the Plaintiff's First Amendment rights outweighs any damages that the Defendant may suffer from not being able to regulate the Plaintiff's SOB. The granting of a preliminary injunction in favor of the Plaintiff will not disserve the public's interest, as a government's constituents have a vested interest in their government enacting constitutionally sound laws that balance the delicate line of serving the greater good of the community while protecting each individual's constitutional rights. Finally, the Defendant is not precluded from correcting the constitutional deficiencies in its Order.

### A. FED. R. CIV. P. 65(c) Security Requirement

Having been granted its application for a preliminary injunction, the Plaintiff must now provide "security . . . in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "[T]he bond requirement serves to protect the interests of both parties." *Phillips v. Chas. Schreiner Bank,* 894 F.2d 127, 131 (5th Cir.1990). " '[F]ailure to require the posting of a bond or other security constitutes grounds for reversal' of an injunction." *Id.* (quoting *Continuum Co. v. Incepts, Inc.,* 873 F.2d 801, 803 (5th Cir.1989) (citation omitted)); *but see Corrigan Dispatch Co. v. Guzman,* 569 F.2d 300, 303 (5th Cir.1978) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."); *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir.1996)

---

**20.** The Court wants to make it clear that it does not believe that any actual or potential economic injury the Plaintiff may incur rises to the level of an irreparable injury. However, any harm to the Plaintiff's constitutional rights do rise to the level of an irreparable harm.

("[W]e have ruled that the court 'may elect to require no security at all.'") (citation omitted). In the event that it is found that the Defendant has been wrongfully enjoined or restrained, the Court determines that the Plaintiff should post a bond in the amount of twelve thousand five hundred dollars ($12,500.00).

## IV. CONCLUSION

It is hereby **ORDERED** that the Plaintiff's application for a preliminary injunction is **GRANTED**, and the Defendant is **ENJOINED** from enforcing its Order against the Plaintiff. It is further **ORDERED** that the Plaintiff post a bond in the amount of twelve thousand five hundred dollars ($12,500.00) in accordance with FED. R. CIV. P. 65(c).